**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |  |
|---|---|---|
| ALAN SCHINTZIUS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-00741 |
| | ) | |
| J. KIRK SHOWALTER, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**<u>BRIEF IN OPPOSITION TO PLAINTIFFS'</u>**
**<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

Defendants James Alcorn (Chairman, Virginia State Board of Elections), Clara Belle

Wheeler (Vice-Chairman, Virginia State Board of Elections), Singleton B. McAllister, Esq.

(Secretary, Virginia State Board of Elections) and Edgardo Cortés (Commissioner, Department

of Elections), by counsel, state the following in opposition to Plaintiffs' Motion for a Temporary

Restraining Order:

**<u>Introduction</u>**

On June 14, 2016, Plaintiff Schintzius submitted his petitions for candidacy for the office

of mayor of the City of Richmond.  On June 21, 2016, Kirk Showalter, the General Registrar,

notified Schintzius that he lacked seven signatures in the Eighth District.  Schintzius elected to

appeal the decision to exclude him from the ballot within the five days allowed by statute.  The

appeal hearing was then set for June 30, 2016, also within the statutory timeframe.

Prior to the appeal, Schintzius submitted a list of nine signatures for reconsideration.  Of

the Plaintiffs in this suit, Schintzius only submitted the names of Plaintiffs Antwanette Brown,

Annquinnette Kenney, and Sharon Smith for reconsideration to the Richmond Electoral Board.

He did not submit the names Korvel Mabry, Phillip Ricks, or Chevis Warren. Of the nine names Schintzius submitted, the Richmond Electoral Board found that Schintzius had provided adequate additional information to verify that three of those persons were qualified voters in the Eighth District. After the appeal hearing, Schintzius was still four signatures short in the Eighth District. Accordingly, his disqualification was upheld. The Richmond Electoral Board informed Schintzius of its decision at the hearing on June 30. The meeting was public, recorded, and Schintzius was present for all deliberations on his appeal. He was given the opportunity to speak and present evidence.

On August 23, 2016, fifty-four days after learning that he was officially disqualified, Schintzius and his fellow Plaintiffs filed a Complaint alleging constitutional violations and seeking injunctive relief and a Motion for a Temporary Injunction seeking prompt relief based on the "urgency of the present situation." (Pls.' Mem. Mot. Temp. Injunction, Section II.E.) The only relief Plaintiffs seek is a rehearing where Schintzius is permitted to submit additional names and evidence that he did not prepare for his first appeal.

In the meantime, Plaintiff requests that this Court order the Commissioner of Elections, the State Board of Elections, the Richmond Electoral Board, and the Richmond General Registrar to halt all carefully scheduled ballot production for the November General Election Ballot to accommodate him.

**Standard of Review**

The standard for granting either a TRO or a preliminary injunction is the same. *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). "[A] preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) ("*Perry II*") (internal

quotations and citations omitted). Granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. *Hughes Network Sys. v. InterDigital Comm'cns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Therefore, preliminary injunctions are "to be granted only sparingly." *Toolchex, Inc. v.. Trainor*, 634 F.Supp.2d 586, 590–91 (E.D.Va.2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir.2003)).

The party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of hardships tips in its favor; and (4) the injunction is in the public interest. *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, No. 116CV592JCCMSN, 2016 WL 3348431, at *4 (E.D. Va. June 15, 2016). All four factors must be satisfied for plaintiff to receive preliminary injunctive relief. *Id.* Put another way, "the failure to show any one of the relevant factors mandates denial of the preliminary injunction." *Marcellus v. Virginia State Bd. of Elections*, No. 3:15CV481, 2015 WL 5285819, at *4 (E.D. Va. Sept. 9, 2015).

A mandatory injunction is one that goes beyond maintaining the status quo and preventing irreparable harm while a lawsuit remains pending. *Handsome Brook Farm*, 2016 WL 3348431, at *4. Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances. *Perry v. Judd,* 471 Fed. Appx. 219, 223–24 (4th Cir. 2012) (internal quotations and citations omitted). Consequently, the court's "application of the exacting standard of review for preliminary injunctions is even more searching when the relief requested is mandatory rather than prohibitory in nature." *Id.*

## Argument

**I.      Plaintiffs' request for relief is barred by the doctrine of laches.**

Plaintiffs' waited 54 days to bring this action.  After sitting on their claims for just over 7 weeks, the Plaintiffs now ask this court to throw a wrench into the electoral process at the eleventh hour.  They request that this Court mandate that the entire election process be stalled so that he has the opportunity for a second bite at the apple.  Where Plaintiffs seek such extraordinary relief, such delay is unreasonable and inexcusable.  Plaintiffs' request for injunctive relief should be denied for failure to bring this action in a timely manner.

The Fourth Circuit has noted that applications for a preliminary injunction affecting ballot access have been "consistently denied when they threaten to disrupt an orderly election." *Perry II*, 471 F.App'x at 227 (citation omitted); *see also Marshall v. Meadows,* 921 F.Supp. 1490, 1494 (E.D.Va. 1996) ("The Fourth Circuit is especially mindful of laches in the context of an impending vote.").  Indeed, the Fourth Circuit has characterized the disapproval of eleventh hour changes to an otherwise orderly election process as "not just caution lights to lower federal courts; they are sirens."  *Marcellus v. Virginia State Bd. of Elections*, No. 3:15CV481, 2015 WL 5285819, at *5 (E.D. Va. Sept. 9, 2015) (citing *Perry II*, 471 F. App'x at 278).

Laches is an equitable doctrine that precludes relief when a plaintiff has delayed bringing suit to the detriment of the defendant.  *Perry v. Judd*, 840 F. Supp. 2d 945, 950 (E.D.Va.2012) ("*Perry I* "), *affd, Perry II*, 471 F. App'x 219 (4th Cir. 2012).  The doctrine applies with particular force in the context of preliminary injunctions against governmental action, where litigants try to block imminent steps by the government.  *Perry I*, 840 F. Supp. 2d at 950. "Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public ... projects do so with haste and dispatch."  *Id.*

4

(quoting *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir.1989); *see also Perry II*, 471 F. App'x at 224 (precluding equitable relief because "equity ministers to the vigilant, not to those who sleep upon their rights") (citations omitted).

Laches requires proof of two elements: (1) lack of diligence by the party against whom the defense is asserted; and, (2) prejudice to the party asserting the defense. *Perry I*, 840 F.Supp. 2d at 953. The first element of laches, lack of diligence, means the plaintiff delayed inexcusably or unreasonably in filing suit. *Id.* An inexcusable delay can only occur after the plaintiff discovers or should have discovered the facts giving rise to his [or her] cause of action. *Id.* The second element is prejudice to the defendant. *Id.* at 953–54. The defendant must prove that it has suffered a disadvantage or some other harm caused by reliance on the plaintiff's conduct. *Id.* at 954. Prejudice can be inferred simply from the plaintiff's delay, or from evidence of specific harm. *Id.* (citation omitted). "The greater the delay, the less the prejudice required to show laches." *Id.* (citation omitted); *see Marshall,* 921 F.Supp. at 1494 ("Delay and prejudice are a complementary ratio: the more delay demonstrated, the less prejudice need be shown.").

In *Marcellus v. Virginia Bd. of Elections*, plaintiffs asked the court to declare that the statutory requirement that limited the extent to which a candidate could attach a political affiliation alongside the candidate's name on the ballot was unconstitutional. *Marcellus*, 2015 WL 5285819, at *1. The plaintiffs also asked the court for a mandatory injunction that would force the State Board of Elections to include the political affiliation on the 2015 November Election ballot. *Id.* at *6. The court found that the plaintiffs demonstrated a lack of diligence by waiting until August 17, 2015 to file suit when they knew, at the latest, on May 21, 2015 that the party identification would be prohibited. *Id.* at *8. Further, the court noted that any changes to

the ballots at this late stage would create a risk that localities would not be able to meet the state-mandated 45 day absentee ballot availability deadline.  *See id.*

In *Perry I* and *Perry II*, the trial court and the Fourth Circuit considered a motion for a preliminary injunction that would require the State Board of Elections to add certain candidates to the presidential primary ballot that had failed to collect the requisite number of signatures allegedly due to a residency requirement for petition circulators.  *Perry I*, 840 F. Supp. at 949. The trial court stated that the candidates had "waited too long to request such relief."  *Id.* at 953. The candidates had filed suit on December 27th after having been denied a place on the ballot on December 22nd and 23rd, but the court stated that the first day the candidates' constitutional rights would have been violated was the first day of the circulation of petitions, dates ranging from July to August of 2011.  *Id.*  The court noted that the "lack of diligence" was "unreasonable and inexcusable" and that it had "significantly harmed the defendants."  *Id.*  In sum, the court found that the plaintiffs eleventh-hour suit had changed the "Board's careful scheduling into a chaotic attempt to get . . . ballots out on time," which "alone amount[ed] to damage that satisfie[d] the laches requirements."  *Id.*

On review, the Fourth Circuit affirmed the trial court's decision and reasoned:

> Movant had every opportunity to challenge the various Virginia ballot requirements at a time when the challenge would not have created the disruption that this last-minute lawsuit has. Movant's request contravenes repeated Supreme Court admonitions that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour. Movant knew long before now the requirements of Virginia's election laws. There was no failure of notice.

*Perry II*, 471 F.App'x. at 221.  The court went on to note that if it granted the requested relief, it would encourage candidates "who knew the requirements and failed to satisfy them to seek at a tardy and belated hour to change the rules of the game."  *See id.*  This would not be fair to the

State or to other candidates who did comply with the prescribed processes in a timely manner" and it would throw the "process into added turmoil." *See id.* In fact, the court warned that the candidates had come "perilously close to asking the federal courts to have state officials act in disregard of federal law," which requires absentee ballots to be mailed 45 days prior to the election. *Id.*

A.     *Plaintiffs were not diligent in filing this action.*

Plaintiff Schintzius knew on June 30, 2016 that the Richmond Electoral Board had found that the General Registrar had reasonably rejected the signatures Schintzius needed to qualify as a candidate for mayor of the City of Richmond. Yet, he waited *54 days* before filing this suit. As in *Perry I and II*, Schintzius also knew the statutory framework for gathering petitions and for appealing a Registrar's rejection of any signatures well before June 30, 2016.

Like in *Marcellus* and *Perry*, such delay has a domino effect on the carefully planned progression of the state election. Naturally, "[b]allots and elections do not magically materialize." *Perry II*, 471 Fed. App'x. at 226. Each election requires "planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Id.* As such, the State Board of Elections "sets timetables for localities to design ballots, order them from printers, proofread mock-ups, and mail them out." *Id.*

For the 2016 November Election, the Department of Elections set a deadline of September 9, 2016 for localities to receive approval on November General Election absentee ballot proofs. (**Exhibit A**, *Election Deadline Calendar*, publicly available at http://elections.virginia.gov/media/calendars-schedules/). This is because § 20302 (a) (8) of the Uniform and Overseas Citizens Absentee Voting Act ("UOCAVA") requires that states make ballots available for absentee voting no later than 45 days prior to an election. Section 24.2-612

of the Virginia Code similarly requires that general registrars make printed ballots available for absentee voting no later than forty-five days prior to any election. For the 2016 general election, absentee ballots must be available, and must be mailed to voters who have requested mail-in absentee ballots, no later than September 24. General registrars' offices not open on Saturdays must make these ballots available and mail them no later than September 23. Prior to that date, ballots must be proofed, approved, printed, and tested.

The state court received the Plaintiffs' Motion for Temporary Injunction and the Complaint a mere 32 days before the 45 day absentee ballot availability deadline and just 77 days before the 2016 General Election. Given that Plaintiffs sat on this claim for 54 days prior to filing, this constitutes inexcusable and unreasonable delay that would "upend the orderly progression of state electoral processes at the eleventh hour." *See Marcellus*, 2015 WL 5285819, at *8 (finding inexcusable delay where the plaintiffs filed the Complaint 32 days before the 45 day absentee deadline and 78 days before the 2015 General Election); *see also Marshall*, 921 F. Supp. at 1491, 1494 (finding laches barred challenge to Virginia election law where the plaintiff filed suit 95 days before the general election).

B. *Plaintiffs' delay prejudices the Defendants.*

Plaintiffs' requested relief would require halting the entire election process for the City of Richmond so that Plaintiff Schintzius could have what no other candidate received – a second chance to dispute rejected signatures from his petition that he failed to raise during his first appeal. Or, as the Complaint requests, Plaintiffs' ask this Court to force the Defendants to place Schintzius on the ballot despite him having failed to meet the requirements for candidacy. (Compl. ¶ 11).

The State Board of Elections is bound "to obtain uniformity in their practices and proceedings and legality and purity in all elections." Va. Code § 24.2-103. Accordingly, the Department creates a timetable for ballot approval and production for localities to promote fair and efficient elections. (**Exhibit A.**) One goal of the Department's work in this regard is avoiding last minute changes to ballots. Eleventh-hour modifications to an election ballot are disruptive and undermine the Department's attempts to ensure orderly elections which are fair to all participants in the electoral process. Such changes may interfere with the uniformity of elections in different localities, and risk voter confusion. Moreover, such changes may create an uneven playing field for candidates for political office by allowing a candidate who did not meet the requirements to be placed on a ballot to run against those who did. If the Department's staff is required to dedicate time and resources to the belated modification of a locality's ballot, it would necessarily take time away from other critical election concerns and preparations, especially in a presidential election year. All of these are significant concerns given the State Board's duties to preserve the uniformity of the electoral process.

Plaintiffs' request that the court force Defendants to include him on the ballot or to enjoin all Defendants from finalizing the ballots for the City of Richmond prevents the State Board of Elections and the Department of Elections from carrying out this duty and compromises their ability to ensure the election complies with federal and state law. The Plaintiffs requested relief has already and will continue to disrupt the SBE's carefully planned schedule for meeting the 45-day requirement, creating confusion for election officials and the public. Much like in *Marcellus*, 2015 WL 5285819, at *9, "the ballot preparation process had well begun statewide when Plaintiffs filed suit."

Plaintiffs' delay potentially prejudices the public, as well. "In a strict sense, the prejudice caused by Movant's delay is to the respondents alone, but in a broad sense, the public is potentially prejudiced as well, as respondents are charged with ensuring uniformity, accuracy, and integrity of Virginia elections." *Perry II*, Fed. App'x. at 227. Changes to Richmond's ballot at this stage would be particularly troublesome and costly.

Plaintiffs waited too long to file, and therefore, the doctrine of laches bars their claims for relief.

## II. Plaintiffs' are not entitled to injunctive relief.

Plaintiffs cannot satisfy the preliminary injunction standard because the statutes and associated regulations are plainly constitutional, the Plaintiffs will not suffer irreparable harm without an injunction, the equities favor the Defendants, and the public has an interest in (1) avoiding untimely eleventh hour challenges to candidacy disqualifications and (2) orderly, uniform, and efficient elections.

### A. *Plaintiffs' are not likely to succeed on the merits of their constitutional claims.*

Under the standard analysis, a plaintiff must make a "clear showing" that it is likely to succeed on the merits of at least one of its claims at trial. *Handsome Brook Farm*, No. 116CV592JCCMSN, 2016 WL 3348431, at *5. To justify a mandatory injunction, however, the movant must demonstrate a clear and convincing probability of success. *Cornwell v. Sachs*, 99 F.Supp.2d 695, 704 (E.D. Va. 2000). The Plaintiffs' have failed to make a clear and convincing showing, or even a clear showing, of probability of success on their constitutional claims.

The Fourth Circuit has noted that federal courts are not well-situated "to monitor the details of elections and resolve factual disputes born of the political process." *Hutchinson v. Miller*, 797 F.2d 1279, 1286 (4th Cir. 1986). Otherwise, federal courts would be "thrust into the

details of virtually every election, tinkering with the state's election machinery, reviewing petitions, election cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Id.* (citing *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970)). The Fourth Circuit reasoned that "[e]lections are, regrettably, not always free from error," but that sifting through these problems is "better suited to the factual review at the administrative and legislative level." *See id.*

i.   Statutory Scheme Overview

Section 3.01.1 of the Code of the City of Richmond provides that a general election to elect the mayor will be held every four years. All persons seeking to have their names appear on the ballot as candidates for mayor must comply with the provisions of Chapter 5 (§ 24.2-500 et seq.) of Title 24.2 of the Code of Virginia. The same code section requires candidates to file a petition containing a minimum of 500 signatures of qualified voters of the city, to include at least 50 qualified voters from each of the nine election districts. In contrast, the Virginia Code only requires that a candidate running for mayor have fifty signatures of qualified voters on his or her petitions. Va. Code § 24.2-506(A)(9).

Under Section 24.2-101 of the Virginia Code, a "qualified voter" must be eighteen years old, a resident of the Commonwealth and the precinct in which he offers to vote, and registered to vote. The section reiterates that "whether a signature should be counted towards satisfying the signature requirement of any petition shall be determined based on the signer of the petition's qualification to vote." Va. Code § 24.2-101. Virginia law requires that all voters update their registration address if they move within the Commonwealth. Va. Code § 24.2-424 ("Whenever a registered voter changes his place of residence within the Commonwealth, he shall promptly notify any general registrar of the address of his new residence.").

11

This year candidates for Mayor of the City of Richmond were required to submit their petitions for review by June 14, 2016. Va. Code § 24.2-507(1). Subsection (B) of Section 24.2-506 requires that the State Board of Elections approve uniform standards for review of these petitions. These standards are set forth in the Virginia Administrative Code and the General Registrar and Electoral Board Handbook (the "GREBook"), a guidance document. The review process requires the appropriate General Registrar to review each petition to ensure the candidate has met the requirements for candidacy. GREBook § 4.2.4.2.

State regulation 1 VAC 20-50-20 shapes this process. This section of the Virginia Administrative Code sets forth certain material omissions related to individual petition signatures that always render that signature invalid. One such material omission occurs when the signer provides a residence address that does not match the petition signer's address in the Virginia voter registration system. 1 VAC 20-50-20 (C)(5). In this circumstance, signature may only be counted as valid if the signer provided an address that is within the same precinct where a voter is currently registered in the Virginia voter registration system, and the signer can be reasonably identified as the same registered voter. *Id.* In short, the review process is meant to ensure that the petition signature purporting to support a candidate in a certain precinct is, in fact, a resident of that precinct who is registered to vote in that precinct.

Importantly, the Department of Elections must provide, upon request and for a reasonable fee, a candidate for office with a list of registered voters for their district to further their candidacy upon request. Va. Code § 24.2-405(A). This list contains:

> the full name, residence address, mailing address, gender, date of birth, registration date, date last registration form received, registration status, locality, precinct, voting districts and voter identification number for each registered voter in the requested jurisdiction, district, or even statewide.

The Department of Elections' website plainly iterates all lists available to candidates under the "Candidate/PAC info" tab and how to order such lists. http://elections.virginia.gov/candidatepac-info/client-services/index.html. One obvious benefit of access to these lists is that the candidate has the ability to review his own petition signatures with the information that the General Registrar will use to conduct the formal review of the petitions.

To ensure uniformity in administration, the SBE provides General Registrars with the GREBook, which contains sections devoted to the petition review process. It is publicly available and describes in detail the role of the residence address in the review. Once a candidate's petition is reviewed, he will receive notice if he failed to provide the requisite number of signatures of qualified voters to support his candidacy. The candidate is also informed with that notice that he may appeal the determination within five (5) calendar days. Va. Code § 24.2-506(C).

Section 24.2-506(C) requires that the State Board of Elections similarly develop procedures for the conduct of a candidate's appeal. The legislature has statutorily limited the scope of the appeal to whether or not the signatures on the petitions were reasonably rejected according to the requirements of Title 24.2 and the uniform standards approved by the State Board for the review of petitions. Va. Code § 24.2-506(C). The standard of review is not whether a rejected signer of a petition was a qualified voter, but whether the Registrar acted reasonably in rejecting the signature based upon the relevant statutory provisions and the available information. *Id.* Immediately after the appeal hearing, the entity conducting the appeal must notify the candidate of its decision. *Id.* The decision on appeal is final and is not subject to further appeal. *Id.*

To ensure timely administration of elections and to ensure that an aggrieved candidate may have his appeal heard in time to place that candidate on the ballot (if justified), the statute requires the appeal to be completed within a specific timeframe. *Id.* A candidate for city office must file his appeal with the local electoral board within five calendar days of the issuance of the notice of disqualification. *Id.*; *see also*, 1 VAC 20-50-30 (C)-(D). The electoral board must hear the candidate's appeal within five business days of its filing. *Id.*

Significantly, the candidate bears the burden of proof in establishing that a sufficient number of signatures from qualified voters were timely provided. 1 VAC 20-50-30(G). The candidate must submit a list of rejected signatures that he wishes to be reviewed and the specific reason for each signature's reconsideration at least two business days prior to the date of the appeal hearing. 1 VAC 20-50-30(G)(1). The candidate may submit documentation clarifying the status of persons whose signatures were rejected for lacking proper registration status or residence. 1 VAC 20-50-30(G)(2). The candidate may also submit affidavits from persons on the list attesting to their identity, which should at least include the name and residence address of the person. 1 VAC 20-50-30(G)(4). The candidate may not, however, submit documentation that a person on his list became registered or updated his voter registration address after the petition filing deadline. 1 VAC 20-50-30(G)(5). For an individual on the list to be counted toward the requisite number, a majority of board members must agree that sufficient evidence exists for the inclusion of that signature. 1 VAC 20-50-30(H). Again, all determinations of the board are final and not subject to further appeal. 1 VAC 20-50-30(I).

ii.    <u>Standard of Review on Challenges to State Election Laws</u>

Rather than conducting separate, crosscutting analyses of electoral restrictions under the rubrics of associative rights, expressive rights, due process, or equal protection, the Supreme

14

Court has articulated a single framework for evaluating the constitutionality of state election laws "based ... directly on the First and Fourteenth Amendments." *Sarvis v. Judd*, 80 F. Supp. 3d 692, 697 (E.D. Va. 2015), *aff'd sub nom., Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708 (4th Cir. 2016) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).  This framework, established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and refined in *Burdick v. Takushi*, 540 U.S. 428 (1992), holds that the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the party's rights.  *Id.* at 698.

The court must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  *Id.* Then, it must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  *Id.*  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  *Id.*  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  *Id.*

When a state election law provision imposes only reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.  *Id.* (citing *Burdick*, 540 U.S. at 434).  In other words, modest burdens are balanced against the extent to which the regulations advance the state's interests, but there is a presumption that important state interests are generally sufficient to justify reasonable, nondiscriminatory restrictions. *Id.* (internal quotations and citations omitted).

The Supreme Court has consistently held that a state may require a candidate for public office to demonstrate their support among potential voters in order to qualify for a place on the ballot. *Amarasinghe v. Quinn*, 148 F. Supp. 2d 630, 636 (E.D. Va. 2001) (citations omitted). The signature requirement is designed to predict whether the potential candidate can garner sufficient support to sustain his or her access to the ballot. *Id.* Such a requirement "weeds out those individuals who, for whatever reason, are unable or unwilling to mount a campaign sufficient to capture the imaginations of voters across Virginia." *Id.* (citations omitted). This requirement is "both reasonable and nondiscriminatory and is justified by the recognized state interest in protecting the electoral process from undue burden posed by frivolous candidates and insincere ballot cluttering." *See id.* Put another way, "[t]his requirement serves the valid purpose of limiting ballot access to candidates with a modicum of support and a viable chance at a election." *Perry I*, 840 F. Supp. 2d at 955.

### iii.   The statutes and regulations at issue are constitutional.

All of the statutes and regulations at issue impose constitutionally-sound restrictions on ballot access. Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. *Sarvis*, 80 F. Supp. at 698. When the restrictions imposed by the Commonwealth are neutral in character and reasonable in magnitude, the Court conducts a more deferential constitutional analysis and the Commonwealth's important interests will usually prevail. *Sarvis*, 80 F. Supp. at 699.

### a.   *The First Prong: Plaintiffs' Interests*

Plaintiffs, including Schintzius, assert that they have been injured by the review process and the ultimate disqualification of their signatures on Schintzius' petition for candidacy.

Plaintiffs argue that requiring petition signers to include their residence address, rather than their registration address, limits their right to participate in the political process because if their residence address differs from their registration address, their petition entry will not count. (*See, e.g.*, Compl. ¶ 59.)

Voters must update their registration address when they move. As such, each voter's registration and residence addresses should be the same. Va. Code § 24.2-424. Where it is not, the review process will still count the signatures if the move was in the same precinct and if other identifiers help determine that the voter is qualified. 1 VAC 20-50-20 (C)(5). Where that fails, candidates have the appeal mechanism where they can provide additional information to show that the voter is a qualified voter in the designated precinct. Va. Code § 24.2-506(C). Thus, the restriction on a citizen's right to sign a petition is not severely burdened. A citizen need only update his registration address to maintain his right to support a candidate with his petition signature.

Schintzius further argues that he has been injured because he was not permitted to operate outside the statutory structure governing his appeal, meaning he was not permitted to present evidence on additional signatures that he did not designate for appeal. (Compl., ¶ 103.) Schintzius has not identified any authority that grants him a constitutional right to an appeal of a general registrar's decision under Va. Code § 24.2-506. Any right to an appeal is a matter of legislative grace. The appeal process is necessarily limited. It presents a candidate with notice of his disqualification and notice of the evidence necessary to overcome that disqualification, combined with the opportunity to be heard. It is not a forum for airing general grievances, but rather a focused effort to reconsider signatures that may have been unreasonably excluded. The limitations are reasonable and geared toward ensuring that candidates are properly added to the

ballot when the requirements of candidacy are met and that voter's signatures are counted where they are qualified to vote in the district they identified as their district of residence.

b. ***Second Prong: The State's Interests***

The interests of the state justify the limited burden imposed by the statutes and regulations at issue. Because the regulations pose only a modest burden, the Defendants "need only marshal its interest and present a logical nexus." *Sarvis*, 80 F. Supp. at 705.

The State and its citizens have an interest in fair, uniform, efficient, and final elections. The goal of the State Board of Elections and the Department of Elections is to ensure that every Virginian is in the same situation when it comes to the election process. Accordingly, eliminating voter fraud is a critical consideration for the State. To have orderly and uniform elections across the state, there must be a system for ensuring that voters are who they say they are and that they are voting for the appropriate candidates based on their residency.

Residency is the geographical marker that helps the State make sure that all voters are treated the same. There is a state interest in registration and maintaining a viable and efficient registration system, which means the State must maintain current address information. A registered voter will vote for every local, state, and federal office at the same polling place, and the offices for which a voter is able to vote depends entirely on where he lives. Residency also raises important rights of representation – where you live determines which candidates you have to choose from to represent you as a voter at all levels of government. With respect to petitions, the State has an interest in making sure that a candidate for any specific office has the requisite support of registered voters within the geographic boundaries of that office.

In the end, all of these statutes and regulations tie back to the State's ultimate goal of uniform and orderly elections across the Commonwealth. This is why the regulations governing

the review of petitions set forth uniform standards for all General Registrars based on residency. Such consistency ensures that all candidates and voter signatures are reviewed in the same way and squares with the requirement that voters update their registration address. This keeps the candidacy process fair. A uniform appeals process is justified for the same reasons. A limited right to appeal allows candidates to seek reconsideration of the voters they believe have been unreasonably excluded and present evidence to that end. Limiting the candidates to one appeal preserves valuable resources at election time, keeps all localities moving forward on the set timeline, and promotes finality in the ballot process.

B. *Plaintiffs will not suffer irreparable harm.*

Plaintiffs' have failed to identify irreparable harm that justifies extraordinary injunctive relief. The plaintiff must make a clear showing that it is likely to be irreparably harmed absent preliminary relief. *Handsome Brook Farm*, 2016 WL 3348431, at *11. Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

Plaintiffs' only argument for irreparable harm appears to be that Schnitzius was denied a place on the mayoral ballot. In support, Plaintiffs cite *Valenti v. Michael*, 790 F. Supp. 534, 574 (E.D. Pa. 1992), where an order from the Pennsylvania Supreme Court resolving a dispute over the drawing of Congressional lines and establishing a due date for petitions of candidacies, which reduced the candidates' collection time from the normal twenty-one days to a mere eight and half days. The Plaintiffs in that case were unable to gather the requisite number of signatures in the time frame. *Id.* at 537. Moreover, some Plaintiffs did not receive notice of the change until days before the deadline. *Id.* at 537–38. This is the context for the court's decision

that the Plaintiffs' had carried their burden for irreparable harm. Preventing this harm was out of the candidates' hands in that case.

Here, Schintzius had five and half months to collect signatures. Va. Code § 24.2-506(A) (only requiring the signatures be dated within the same year the election is being held, meaning candidates can begin collection after January 1 of the election year). He is not on the ballot because he did not collect enough signatures, and when offered the opportunity to present evidence to meet the uniform requirements of candidacy, he failed to present sufficient evidence. He did not start collecting signatures until March 27, 2016. (Compl., Exhibit A.) He was given every opportunity to seek help from the local Board of Elections, to review lists of registered voters to ensure his lists qualified under the regulations, and to present evidence on appeal. In truth, he only asked for review of three of the Plaintiffs' signatures – he did not seek review or present any evidence on the other three Plaintiffs. (Compl., Exhibit B.) He is not irreparably harmed by the statutes and regulations that structured his run for mayor. Schintzius was the master of his own candidacy, and his own tardiness and failure to take advantage of all of the resources and opportunity available to him are the sources of his harm. There is no irreparable harm for which an injunction would be an appropriate remedy.

### C. *The balance of hardships tips in favor of the Defendants.*

The statutes and regulations at issue in this matter are constitutional. Plaintiffs' have not been unconstitutionally burdened in any sense. The burden of collecting enough qualified voters to qualify for candidacy is properly on the candidate, not the State. Schintzius had adequate notice and time to present evidence that he had met the candidacy requirements. There was no "gotcha" situation on the petition form – rather, the form sought the information necessary to verify that the signer was a qualified voter in whatever district they claimed to represent.

**Though Plaintiffs' speak generally about this being a "burden on Plaintiffs' First Amendment rights," they fail to articulate *how* this requirement unjustifiably burdens those rights where all voters are required, by law, to have the same registration and residency address.** Asking for accurate information to determine whether a voter is qualified does not heavily burden Plaintiffs' First Amendment rights, but rather, serves an important state and public interest of preventing voter fraud.

      D. *The injunctive relief requested is not in the public interest.*

Plaintiffs' erroneously claim that there is "no public interest served by the actions of the defendants, which made it as hard as possible to arrive at a reasonable conclusion on all the facts available to the government at all times." (Mot. Temp. Inj., Section III.C.) Plaintiffs' argue that Schintzius was denied the right to be on the ballot when he had "earned a spot." Schintzius did not earn a spot on the ballot. The public does not have an interest in allowing candidates who fail to meet the uniform standards to be on the ballot. In fact, placing candidates on the ballot that did not garner sufficient support from qualified voters undermines the rights of voters that did comply with the law regarding voter registration. Similarly, forcing a candidate that did not meet his burden on the ballot is not fair to the candidates that did marshal the requisite support for their candidacy.

All candidates for mayor in the City of Richmond must meet the same requirements for candidacy. Plaintiff Schintzius was afforded ample opportunity to "compete in the electoral process." He failed to collect the requisite number of signatures of qualified voters in the Eighth District, and he failed to present sufficient evidence on appeal to rectify that shortcoming. At all times, Schintzius had the ability and resources "to avoid this situation."

Finality in the electoral process is in the public interest. To ensure a fair and uniform election, there must be a point where candidates have simply failed to marshal enough support to make it to the final ballot. If a candidate cannot present sufficient evidence in one appeal, how many appeals should the State grant him? Should one candidate be afforded greater opportunity for review than another because his petition was only seven names short? Ten names short? The State's answer is what it always is: the process must be uniform as to each candidate for fairness and integrity in the process. The Constitution does not require that Plaintiff Schintzius receive endless time, resources, and opportunity to present his opinion on the constitutionality of the appeal process. There is an obvious state interest in regulating elections to provide a reasonable structure to prevent uncontained chaos in the electoral process.

The public interest also favors measures to prevent voter fraud in petitions for candidacy. For example, Plaintiffs state they would have "gladly" put their registration address if they had known this would have made their signatures "valid" under the review process. This point misses the mark. This inaccuracy would defeat the purpose of the local law requiring a mayoral candidate to receive signatures from fifty qualified voters in each district. If a voter is no longer a qualified voter in the district where she is registered because she has moved, including her signature in that district's total is improper. The effect of such behavior would be that signatures of qualified voters in each district would have the same value as signatures of unqualified voters improperly asserting residency in a certain district.

The public interest favors prohibiting candidates from throwing a wrench into the electoral process at the eleventh hour. It wastes government resources and breeds voter confusion. This is especially true where Plaintiffs sat on their request for relief for fifty-four days in a presidential election year.

## Conclusion

For all of these reasons, Defendants James Alcorn (Chairman, Virginia State Board of Elections), Clara Belle Wheeler (Vice-Chairman, Virginia State Board of Elections), Singleton B. McAllister, Esq. (Secretary, Virginia State Board of Elections) and Edgardo Cortés (Commissioner, Department of Elections), by counsel, respectfully request that this Court deny Plaintiffs' Motion for a Temporary Injunction because it is barred by the doctrine of laches and Plaintiffs' have failed to satisfy the temporary restraining order standard.

**James B. Alcorn, Clara Belle Wheeler, Singleton B. McAllister, Esq. and Edgardo Cortés**

By:  /s/  Erica B. Mitchell
Erica B. Mitchell (VSB No. 89420)
Harold E. Johnson (VSB No. 65591)
WILLIAMS MULLEN
Williams Mullen Center
200 South 10th Street, Suite 1600 (23219)
PO Box 1320
Richmond, VA  23218-1320
Telephone:  (804) 420-6000
Facsimile:  (804) 420-6507
Email:  emitchell@williamsmullen.com
Email:  hjohnson@williamsmullen.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

William W. Tunner, Esq.                 William F. Etherington, Esq.
Michael G. Matheson, Esq.               Leslie A. Winneberger, Esq.
ThompsonMcMullan, P.C.                  Beale, Davidson, Etherington & Morris
100 Shockoe Slip, Third, Floor          701 E. Franklin Street #1200
Richmond, VA  23219                     Richmond, Virginia 23219

Mark S. Paullin, Esq.
Law Office of Mark Paullin
575-A Southlake Blvd.
Richmond, VA 23236

I hereby certify that on the 9th date of September, 2016, I sent a copy of the foregoing to the following by email:

Paul Goldman
Morrissey & Associates, LLC
605 E. Nine Mile Road
Highland Springs, VA  23075
goldmanusa@aol.com

By:_____/s/  Erica B. Mitchell_____
     Erica B. Mitchell (VSB No. 89420)
     Harold E. Johnson (VSB No. 65591)
     WILLIAMS MULLEN
     Williams Mullen Center
     200 South 10th Street, Suite 1600 (23219)
     PO Box 1320
     Richmond, VA  23218-1320
     Telephone:  (804) 420-6000
     Facsimile:  (804) 420-6507
     Email:  emitchell@williamsmullen.com
     Email:  hjohnson@williamsmullen.com
     *Counsel for Defendants*