IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


Alan Schintzius, et al.,

                              Plaintiff,

        versus                          3:16 CV 741

J. Kirk Showalter, et al.,

                              Defendants




        Before:  HONORABLE JOHN A. GIBNEY, JR.
             United States District Judge



                Motion - TRO



             September 12, 2016

             Richmond, Virginia




             GILBERT F. HALASZ
          Official Court Reporter
             U. S. Courthouse
           701 East Broad Street
           Richmond, VA 23219

APPEARANCES


Mark Paullin, Esq.

Paul Goldman, Esq.

For the plaintiffs



Michael Matheson, Esq.

William Prince, Esq.

for defendants Showalter, Stevens, Dabney


William Etherington, Esq.

for defendant Daniels


Harold Johnson, Esq.

Erica Mitchell, Esq.

for defendants Alcorn

Wheeler, McAllister, Cortes

1          THE CLERK:  Case number 3:16 CV 741.

2          Alan Schintzius and others versus J. Kirk Showalter

3    and others.

4          Plaintiffs are represented by Mr. Mark Paullin and

5    Mr. Paul Goldman.

6          The defendant Showalter, Stevens and Dabney are

7    represented by Mr. Michael Matheson and Mr. William

8    Prince.

9          The defendant Daniels is represented by Mr. William

10   Etherington.

11         Defendants Alcorn, Wheeler, McAllister and Cortes are

12   represented by Mr. Harold Johnson and Ms Erica Mitchell.

13         Are counsel ready to proceed?

14         MR. GOLDMAN:  Yes, ma'am.

15         MR. JOHNSON:  Yes, Your Honor.

16         THE COURT:  All right.

17         We are here today on the plaintiffs' motion for a

18   temporary restraining order essentially -- well, I am not

19   entirely sure what they are asking, but the object of this

20   is to either give them time enough to get Mr. Schintziu's

21   name on the ballot for the November mayoral election or to

22   actually have me he but on the ballot.

23         I have received voluminous pleadings, and I want to

24   thank all of you for giving me something to read other

25   than novels on my vacation.

1       And I have reviewed the complaint, the motion for

2   temporary injunction, and the oppositions filed by the

3   various defendants in this case.  And I am ready to go

4   forward at this time.

5       So, I have also entered an order this morning

6   granting Mr. Goldman's opportunity to appear pro hac vice

7   in this case.

8       So, Mr. Goldman, let's hear from you first.

9       It is your motion, sir.

10      MR. GOLDMAN:  Thank you, Your Honor, for

11  letting me --

12      THE COURT:  Happy to have you.  I am surprised you

13  are not a member of the bar down here.  You have been

14  around for a long time.

15      MR. GOLDMAN:  A good and bad thing, right?

16      THE COURT:  Well, always good to have good lawyers

17  here.

18      Move the microphone a little bit so you are talking

19  into.  Thank you, sir.  All right.

20      MR. GOLDMAN:  First I want to say that we appreciate

21  the service that everybody -- I know Ms Showalter,

22  registrar's office, worked extremely hard.  We are trying

23  to get to the facts of the case, and we think basically we

24  have six African-American plaintiffs who have been denied

25  their Constitutional rights and petition, a very important

1   right.

2       THE COURT:  Before we get to that, let's address the

3   preliminary issue, which is, the one I mentioned in my

4   order entered last week, whether there is a conflict in

5   this case between plaintiffs' counsel and their clients,

6   really.  And the gist of that is --

7       MR. GOLDMAN:  I don't think there is any conflict

8   whatsoever.

9       THE COURT:  Let me just say for the record what it

10  is.  Mr. Morrisey, and now you, are counsel -- and thank

11  you, sir, for your quick appearance in this case,

12  Mr. Paullin -- have filed this motion on behalf of

13  Mr. Schintzius, and the issue that concerns me about it is

14  that Mr. Schintzius and Mr. Morrisey are contesting -- are

15  trying to get to the same position, and one would argue

16  that, one, Mr. Morrisey's -- one position he could easily

17  take in this case would be Mr. Schintzius should not be

18  admitted because that is one less person he has to knock

19  off in order to get elected as mayor.

20      MR. GOLDMAN:  Well, he is going to address -- he

21  addressed that.  That is why he took the case.  He is

22  perfectly happy to have Mr. Schintzius on the ballot.

23  Both of us are really just in terms of, we were here

24  before.  I was here in Judge Hudson's court in 2012.

25  That's why we have the limited -- we won that case, and

1   that led to getting legislation passed, limited right of

2   hearing.  Mr. Morrisey and I were also in Circuit Court of

3   Richmond in the case of Ryan versus Showalter, which we

4   won that case, also.  That led to the change in the

5   definition of qualified voter.  So we have been doing this

6   for a particularly long time.  Mr. Schintzius came to me

7   for obvious reasons, there is not that many people who

8   handle these things any more, if ever.  He is perfectly

9   aware, and there is no conflict in anybody's mind --

10      THE COURT:  Well --

11      MR. GOLDMAN:  -- in terms of the minds of

12  Mr. Morrisey, myself and Mr. Schintzius.

13      THE COURT:  His name is Schintzius, is it?

14      PLF COUNSEL TWO:  Schintzius.

15      THE COURT:  Okay.

16      Mr. Schintzius, thank you for coming today, sir.  I

17  appreciate it.  You don't have to stand up, that is okay,

18  but I do appreciate you coming today.

19      You guys may not think there is a conflict, but there

20  certainly is an appearance that -- I am assuming

21  Mr. Morrisey wants to be elected.  And having the field

22  pared by one helps him in that respect, doesn't it?

23      MR. GOLDMAN:  Going into the politics, I can put on

24  my own party campaign manager, but the fact of the matter

25  is there really is no competition between the two.  In

1  fact, in the real politics they have discussed it, they

2  are not even on the same wave length, and --

3      THE COURT:  If they are not on the same wave length,

4  they have got a problem.

5      MR. GOLDMAN:  In terms of politics.  It may seem like

6  there is a conflict, but there is no political or any

7  other consequence, which is why we are doing it, and why

8  we discussed it.  That has been discussed.

9      THE COURT:  You have something from Mr. Schintzius

10  waiving any conflict?

11      MR. GOLDMAN:  We have talked to him about that.  You

12  asked he --

13      THE COURT:  Does he?

14      MR. GOLDMAN:  Excuse me?

15      THE COURT:  Do you have something in writing that

16  does that?  Mr. Schintzius was standing up.

17      MR. GOLDMAN:  We have never -- we have never asked

18  for anything in writing.

19      THE COURT:  All right.

20      Well, go ahead with your argument.

21      MR. GOLDMAN:  Your Honor --

22      THE COURT:  This is something that you are going to

23  have to address as you go long in this case.  Okay?

24      MR. GOLDMAN:  Yes, sir.

25      THE COURT:  All right.

1    MR. GOLDMAN:  We will get it in writing.

2    THE COURT:  I didn't mean to throw you off.

3    MR. GOLDMAN:  The three Constitutional rights at

4    issue here, right of petition, the right of due process,

5    and then when you have qualified for the ballot, when you

6    have met all the requirements of the candidates, the right

7    of access once he you have met the requirements.

8    THE COURT:  The third is another first amendment

9    right; is that right?

10   MR. GOLDMAN:  Valid access right, especially, first

11   amendment right through the 14th amendment and how the

12   cases are decided with Bullock and the other cases.  And

13   they have been developed, a little more murky when you

14   talk about the actual right of the candidates.  This is

15   why you plead the cases with the signatory, it is hard to

16   get them, not easy to get people to say, yes, go to

17   federal court.  But its important because ultimately it is

18   their right.  They are the associational right.  They want

19   Alan on the ballot.  And that is their right.  And that is

20   what is being denied.  And it is not just them.  All of

21   the other people who signed his petition.  Ms Showalter

22   found 670 qualified voters.  I think that was the number.

23   They are all having their associational rights denied if

24   he is off the ballot.  And we go through the facts, I

25   think you see it is very clear.

1        In terms of the right of petition, I believe it is

2    actually controlled by the case of the Libertarian Party

3    versus Judd.  I don't have to explain that particular fact

4    in this case.

5        THE COURT:  I am pretty familiar with that one.  The

6    is the one where I threw out part of the petition process,

7    right?

8        MR. GOLDMAN:  Right.  Having been former party chair,

9    I followed this case closely as to what was going on in

10   the Republican Party at that time.

11       The way The Court saw the case, correctly so, the

12   Libertarian Party was trying to get on the ballot.  In

13   fact, they even know one of the petitioners that was sort

14   of referenced in the case.

15       And they needed to pay, actually that was only way to

16   get on the ballot.  People might say that is very

17   complicated, it is a long process, it was ten thousand

18   votes.  It is now five.  Myself and Mr. Cuccinelli knocked

19   it down to five.  We, the legislature, agreed it is too

20   hard.

21       Now, why do they need more circulators?  It isn't --

22   they don't need more circulators really to spread the

23   message of the Libertarian Party.  They could always bring

24   in people outside the spread the message.  But as we know

25   from the cases, it is through candidacy, just getting

1   people on the ballot because really in our country ever

2   since, I think the Supreme Court in Illinois versus Social

3   Workers Party, that is how we do things.  You try to get

4   people on the ballot.  That is how you spread the first

5   amendment core speech.  So they needed more circulators.

6   More circulators, more chance to associate.  You can't

7   circulate your own.  You can't sign your own.

8        THE COURT:  Getting away from that for a second, it

9   is pretty clear, isn't it, that a requirement of a certain

10  number of signatures is a valid requirement.

11       MR. GOLDMAN:  Absolutely.

12       THE COURT:  And that that -- that the local

13  government, or state government for that matter, can

14  insist that you have a certain number of signatures from

15  each district to show that there is a breadth of support.

16       MR. GOLDMAN:  No question that is the way it was

17  done.  That was, obviously --

18       THE COURT:  When I talk, you be quiet.  And when you

19  talk, I will be quiet.  Okay?  Thank you.  So let's try

20  that.

21       Go ahead.

22       MR. GOLDMAN:  So that in that particular case besides

23  not meeting the ten thousand, it was found that the law

24  that says if you are out of state you couldn't come in,

25  you had to be a Virginia resident, was too broad.  In

1     fact, the Fourth Circuit said the crux of that case was

2     even though there was a compelling interest of the state

3     to protect against fraud, and you still had to show that

4     it was the least onerous, or that wasn't -- it was the

5     least onerous I would say, way to do it.

6          Also said, Ashcroft said it was the government's

7     burden to show that proposals, that proposals, say, from

8     the other side, were in fact more onerous than that they

9     were doing.  So in that particular case, absolutely.  And

10    it has worked perfectly.  Worked perfectly.  There is no

11    fraud.  Let's take this case.  In this case they have

12    decided to have a petition form and implemented the

13    petition form, it doesn't warn people.  Every single

14    person that we represented signed that petition form

15    precisely the way they were instructed to.  They put down

16    the precise information that is required in 24.2-506 (a)

17    of Virginia code.  They did everything right.  But they

18    were denied their Constitutional rights to petition.  Why?

19    I called it a gotcha provision.  Referencing, of course,

20    the Briscoe case where there is a technical rule.  They

21    don't tell you that they really don't want your resident

22    address as much as they want your registration address.

23         THE COURT:  But under Virginia law when you change

24    your residence you are required to re-register promptly,

25    are you not?

1          MR. GOLDMAN:  Actually --

2          THE COURT:  That is the precise wording.

3          MR. GOLDMAN:  The truth of the matter is Showalter

4   will tell you that you can actually go back and vote at

5   your, if you move, you can go back months later and still

6   vote at the, where you are no longer live.  That is in the

7   law.

8          THE COURT:  I understand.  But the law also says you

9   are required to change your residency, or your

10  registration promptly when you move.  Doesn't it say that?

11         MR. GOLDMAN:  Maybe, but that is not the -- the fact

12  of the matter is, the definition of qualified voter in the

13  statute says, somebody who is on the system and is active,

14  you can be -- all these people are on the system and they

15  are active.

16         THE COURT:  Here is what section 24.2-424 (a) says,

17  "whenever a registered voter changes his place of

18  residence within the Commonwealth he shall promptly notify

19  any general registrar of the address of his new

20  residence."

21         So these people should have had the correct address

22  on record, shouldn't they?

23         MR. GOLDMAN:  The petition forms, it would be nice if

24  they, if everybody did that quickly.  The law recognizes

25  you don't.  That is why the allows you to go back because

1  we are a mobile society and people don't always do things

2  rapidly.  We are also not talking about the right to vote,

3  we are talking about the right to petition.  In a

4  qualified voter -- put this up -- that is the statute

5  defining qualified voter.  That was asked in 2013 after

6  the Ryan case.  In the Ryan case Judge Hughes over the

7  objections of the registrar found that people who have

8  been a resident -- they were residents of the sixth

9  district, but their registration address was outside.

10  They had not changed it.  He counted all of those folks in

11  part based on a 1975 Attorney General's opinion which

12  said, in effect, in the City of Petersburg that people

13  should be counted where they are residents if they were

14  registered in the City and still had time to update their

15  registration before the election.

16      THE COURT:  Are you challenging the constitutionality

17  of the State Board of Election's regulation that deals

18  with things that are disqualification?  Is that what you

19  are saying, that this reg is unconstitutional?

20      MR. GOLDMAN:  What I am saying, Your Honor, is that

21  24.2-506 "a," which is the state law saying what is

22  supposed be on your petition, says specifically, signature

23  of a qualified voter and their residence.  Doesn't say

24  anything about registration address because in Virginia

25  you have to be a resident.

1      THE COURT:  It says "residence."

2      MR. GOLDMAN:  Excuse me?

3      THE COURT:  Doesn't the petition say your residence?

4      MR. GOLDMAN:  It says "residence," not your

5   registration address.  They are different.

6      THE COURT:  Then they check.  So what they do is they

7   check, they take, as I understand it, they take the

8   information on the petition and check it to see where you

9   are registered because they are required to have people in

10  each district or area that sign the petition.  And that

11  is -- how else would you do that?

12     MR. GOLDMAN:  I will get to that.  But your

13  registration address is not necessarily your residence

14  address.

15     THE COURT:  Well, that's right.

16     MR. GOLDMAN:  So, you see --

17     THE COURT:  What are you supposed to do, drive out to

18  everybody's house and see if they are living there?

19     MR. GOLDMAN:  There are ways to do it, and I can show

20  you that.

21     THE COURT:  Let's hear that.

22     MR. GOLDMAN:  We mention that -- the two real

23  requirements in the law basically -- probably too small

24  for people to read -- the law requires you to sign and

25  requires you to put down your residence address.  They

1   don't check the signatures.  As we say, they can't check

2   whether that is your residence address.  They don't have

3   the resources, and we mention that.  So for bureaucratic

4   convenience -- and we don't oppose that -- what they is,

5   look, we are just going to assume if Paul Goldman's name

6   appears on a petition and he lists his -- and the

7   residence address matches your registration address, we

8   are going to count it.  Even though we don't check his

9   signature.  Somebody could have signed it, and we have no

10  idea whether he actually lives there, and the law requires

11  that he be a resident.  But I understand we say that in

12  the brief, it -- we are not going to ask people to spend a

13  lot of money checking signatures.

14      Okay.  I have no problem with that.  But let's

15  remember that there are people in there who do not, are

16  not, you know, they put down the registration address and

17  they move.  Legally they are not entitled to sign a

18  petition.  And they mention that in their opposition.  You

19  have to be a resident.  But just because you list your

20  residence address, they only people that they know who the

21  residence address are C 6 plaintiffs because they put down

22  the resident address that was different than the

23  registration address, which is precisely what the law

24  requires, precisely what the petition requires, but they

25  lose their right to vote.

1    THE COURT:  They don't lose their right --

2    MR. GOLDMAN:  They lose their right to petition.

3  They lose their right to sign that petition, which is

4  supposed to -- and they are all qualified voters, all

5  qualified voters under the definition.  And why is that?

6  Why is their signature, their first amendment petition

7  right denied?  Number one, because there is nothing on the

8  form to tell them, by the way, yes, you are a qualified

9  voter, but if want your petition signatures to count, if

10  you want your petition signatures to count you are an

11  active member, you are on the registration system, and you

12  are active, so you qualify.  If you don't don't -- they

13  don't tell you, if you do not update your registration

14  address by the time they count the signatures you will be

15  put in a pile of, well, there is a Paul Goldman says XYZ

16  Street in the eighth district.  Well, there is a Paul

17  Goldman in the eighth district, maybe just one -- I will

18  slow that, but he is listed at a different address, we

19  can't prove that is the same person, so they put them in a

20  can't identify pile.  I have no problem with.  That.

21  Because it makes sense why do I have any problems with

22  that?  Because what is the goal?  The associational right

23  to get your candidate on the ballot.  So if they go

24  through the list the way they do, and just match up the

25  names to the registration address, and you get on the

1    ballot, it doesn't -- everybody is happy.  The

2    constitution is fine.  I got on the ballot.  That is what

3    may petition is.

4        Let's assume you are in this case and you are down

5    seven.

6        THE COURT:  How many did he protest about in his

7    appeal?

8        MR. GOLDMAN:  He only protested seven or eight.

9    There were nine.  They counted three.  There is three more

10   I think they definitely should have counted, there is

11   somebody who is --

12       THE COURT:  So still a couple short?

13       MR. GOLDMAN:  Well, no, there is -- he is three and

14   there is also, well, there is actually, there is another

15   person who would be a plaintiff that they could have

16   signed.  She didn't want to be a plaintiff.  And also they

17   said a signature was illegible.  It's not, obviously, if

18   he is one of the plaintiffs in this particular case.

19       The other thing, though I would like to get into

20   that, they did not give the due process hearing the way it

21   was envisioned.

22       THE COURT:  Let's stick with the first amendment.

23       MR. GOLDMAN:  Stick with the first amendment.  All

24   they had to do -- and this is why I say it is just like

25   the Libertarian Party case versus Judd, all they had to do

1  was put something on the petition.  By the way, you have a

2  protected Constitutional right.  But this how we are going

3  to do it, Mr. Goldman.  We are not going to tell you,

4  though.  We aren't not going to tell you.

5      THE COURT:  They shouldn't have to tell you,

6  Mr. Goldman, because when you move, you are supposed to

7  properly change your address.

8      MR. GOLDMAN:  Your Honor, you can still be a

9  qualified voter, so the average person doesn't know that.

10      THE COURT:  But it is like a speed limit sign.  The

11  sign says, doesn't say, by the way you also need to have a

12  license to drive in Virginia.  And if you get stopped and

13  you don't have a license, you get a double ticket, don't

14  you?

15      MR. GOLDMAN:  At least, Your Honor -- I am a citizen

16  of.

17      THE COURT:  I know you are a citizen.

18      MR. GOLDMAN:  I am just metaphorically --

19      THE COURT:  Oh, hypothetically.

20      MR. GOLDMAN:  -- hypothetically, I am a citizen.  I

21  have a constitutional right to petition.  The State has

22  the right to regulate, but very limited.  Can the State

23  have a mandated form of petition?  Absolutely.  Can the

24  State ask for certain information?  Absolutely.  No

25  problem.  I go to exercise my right of petition.  They

1    give me a petition form.  It follows precisely what the

2    law requires me to do.  I sign my name.  I list my

3    residence address.  I date it.  I exercised -- all I know,

4    however, always in the Brisco case, by the way, there is a

5    gotcha provision, if you move, even though you are still a

6    qualified voter, even though you meet definition of a

7    qualified voter, we are going to put you in a pile.  You

8    will not have your right to have it counted.  In terms of

9    the Judd case, all they had to could was put on the

10   petition, by the way, if you have moved make sure that you

11   updated it because if you don't, you may lose your right

12   to --

13        THE COURT:  No, no, the Judd case dealt with the

14   people who were circulating the petition.

15        MR. GOLDMAN:  But --

16        THE COURT:  Didn't say anything about what was in the

17   petition.  The Judd case said, you are allowed to bring in

18   people from out-of-state to circulate petitions to vote.

19   Right?

20        Am I misremembering that case?

21        MR. GOLDMAN:  I am talking about the crux of the

22   case, not about the facts, the crux of the case.

23        THE COURT:  I mean, the facts of the case are sort of

24   what I decided.

25        MR. GOLDMAN:  Well, but, the decision was a challenge

1    to the unconstitutionality of the law.

2        THE COURT:  Of the provision.

3        MR. GOLDMAN:  Right.

4        Of the out-of-state provision.  They said that the

5    crux of the case, even though the State had a compelling

6    interest, they had to show that the way they were

7    regulating this Constitutional right was the least

8    onerous, so it was decided that a statute that made it

9    impossible for everybody was too onerous, and they

10    proposed well, just make people available by subpoena.  If

11    you think that -- and that was accepted.  That is why I

12    say the same thing here.  All they had to do was tell

13    people, instead of disqualifying everybody who moved and

14    making them prove at a hearing, or all they had to do was

15    say on the form, by the way, you have a Constitutional

16    right.  We are protecting it.

17        THE COURT:  But the thing of it is, they could list

18    every election requirement known to man on the petition,

19    but it gets a little cumbersome.

20        MR. GOLDMAN:  Not if the number one information they

21    want to know is your registration address.

22        THE COURT:  Well, their number one information that

23    they might, that Mr. Schintzius might want them to know is

24    residence versus registration address.  But I would

25    suggest that the people at the Board of Elections would

1    want to know a lot of other things.  Electoral Board,

2    rather.

3         MR. GOLDMAN:  Excuse me.

4         THE COURT:  I will tell you what.  What else do you

5    have to say about the first amendment aspect, and then due

6    process?

7         MR. GOLDMAN:  In terms of that, when they have these

8    people they disqualify, they have signatures.  They have

9    other information which would qualify them.  But they

10   never look it up.  If they had checked the signature on

11   the form versus signature in the information they had,

12   there is only six or seven they have to do, they could

13   match them up and they could prove that that was the

14   person.  They don't do that either.  That is why I say a

15   de minimus effort on the part of the government would save

16   somebody's right to petition, and that is why I compared

17   it to the Judd case, because that is essentially what the

18   Fourth Circuit cast saying.  The crux of it is, yes, you

19   have the compelling interest to stop fraud, but how are

20   you doing it?

21        Here, using a Bureaucratic, you know, efficiency.

22   Well, we are not going to have let you have your right to

23   petition because we don't want to look up the signature,

24   it is too much effort there.  They are throwing it all

25   into the hearing.  The person who signed the petition is

1    never told their signature has been disqualified.

2        THE COURT:  All right.

3        MR. GOLDMAN:  Okay.  They have a right.  They have

4    done everything the State said they needed to do to fill

5    out the form.  The residence address is what is required

6    in the law.  That is what is required on the form.  They

7    use the registration address to check, but they never tell

8    me when I am filling out the form.  It is just not like

9    they have got to tell me everything.  It is the most

10   important information.

11       THE COURT:  If it is so important, why don't they go

12   and change the registration when they move?  I mean it is

13   pretty important for your ability to vote, isn't it?  Do

14   you have to live where you vote.

15       MR. GOLDMAN:  Let me give you an example.

16       THE COURT:  All right.  Give me example.

17       Well, now, you have gone beyond my read -- you can

18   hand it to me.  Give it to her, and she will hand it to

19   me.  So this is a chart that says voters wrongly denied

20   Constitutional rights by the State hidden gotcha -- stay

21   up there at the podium, please.  Thank you.

22       All right.

23       MR. GOLDMAN:  I want to use the top one, Your Honor.

24       THE COURT:  What?

25       MR. GOLDMAN:  Ed Brown as an example.  At the top,

1    disqualified.

2         THE COURT:  Right.

3         MR. GOLDMAN:  Antoinette Brown voted in 2012, 2013,

4    2014, 2015.  At the same address.

5         THE COURT:  Okay.

6         MR. GOLDMAN:  Decatur Street.  However, when she

7    signed the petition she had moved to Edwards.  Signed the

8    petition and moved to Edwards Street.  So when you looked

9    up Antoinette Brown on the eighth district voter list you

10   would have found one person named Antoinette Brown in the

11   whole eighth district.  But since the Decatur Street

12   address appears as the registration address, but our

13   residence address on the form was Edwards, she was

14   disqualified.  Even though on when she voted on 2015 she

15   had to show a local election official proof she lived

16   there.  So she definitely lived there, can we agree she

17   definitely lived there, she showed a local official.  All

18   right.

19        She was disqualified because she put the wrong

20   address.  You put a residence address as required.  She

21   can this November go back to the Decatur Street, assuming

22   she had not updated, she has yet to update her voter

23   registration, she can go back to Decatur Street this

24   November and vote.  That is the law in Virginia.

25        THE COURT:  Is that in a different precinct?

1     MR. GOLDMAN:  The same district.

2     THE COURT:  Is Decatur Street a different precinct,

3  is my question.

4     MR. GOLDMAN:  Yes, they are.  They are different

5  precincts, but the law is clear, and she moved after the

6  November election.  She could vote as long as she stays in

7  Virginia.

8     See, there are other move dates.

9     THE COURT:  So if she moves out of the City, she

10  can't vote in the mayoral election.

11     MR. GOLDMAN:  Actually she could.  As i understand

12  it, I believe she could move anyplace in Virginia and

13  still go back to where she votes.  If she moved --

14     THE COURT:  Okay.

15     MR. GOLDMAN:  And then there is some other less

16  restrictive rules, but everybody, all these people could

17  vote.  They were qualified voters.

18     THE COURT:  Well, let me ask you.  Do you have any

19  case authority that deals with a similar situation to

20  this?

21     MR. GOLDMAN:  Well, the only other authority that I

22  have was the Hughes case.  If I could explain the case,

23  and Ms Showalter was there, that was not a written

24  decision, but it was done -- I don't know if you know

25  Judge Melvin Hughes.

1      THE COURT:  I know who Melvin Hughes is.

2      MR. GOLDMAN:  We argued this case in front of him,

3  similar situation.  Came down to plaintiffs in the sixth

4  district, which he, I think used to live in the sixth.

5      THE COURT:  Was that a petition case?

6      MR. GOLDMAN:  Yes.

7      THE COURT:  Okay.

8      MR. GOLDMAN:  What they had done was this.

9      They all lived in the eighth district, excuse me, the

10  sixth.  They lived in the sixth district.  But their

11  registration in the City of Richmond was in the other

12  district outside.  So what would I call a jumper.  Okay.

13  it was a big argument.  He said, is there any reason why I

14  can't count them where they are living?  Because that is

15  what the petition says.  And he counted them.

16      There is a 1975 Attorney General opinion by Andrew

17  Miller, and that asked the question, he said, City of

18  Petersburg, which is also a ward like Richmond, and he

19  said that if you are living in ward X and that is where

20  you sign, but you are registered in ward Y, you should be

21  counted where you are living as long as you can have time

22  to update your registration before the election.  Now,

23  granted, it is 1975 Attorney General opinion.  I

24  understand that.

25      It is totally consistent with the first amendment,

1    and totally consistent with the scheme here.  As I just

2    showed you, we know in our society people move, and we

3    know people don't update their registration all the time.

4    It is not the first thing on their minds.  And we know

5    that they can actually go back to their the old precinct

6    and even vote if they don't do that.  We are trying to get

7    people to vote, and we worked hard to do that.  So a

8    petition right, that is why we changed it.  When you say

9    as long as you are on the voter registration system, and

10   active, it doesn't say anything about move date and

11   signing the petition.  Because people don't -- they just

12   don't do it in our society, particularly -- and let me get

13   to that because I think it is important -- how come we all

14   African-American plaintiffs here in ninth district?  How

15   come.

16       THE COURT:  I don't know.  You are the one that filed

17   the law suit.  Why is it that we have all the

18   African-American plaintiffs?

19       MR. GOLDMAN:  That is all there were.  Why were they

20   all African-American plaintiffs?  They were the ones

21   knocked off that we could find in the Epps case.  In the

22   Ryan case, I believe they are all African-American.

23       THE COURT:  Okay.  Are you telling me that this is --

24   that there is a racial element to this?

25       MR. GOLDMAN:  I don't claim racial -- absolutely --

1          THE COURT:  Then why is it relevant?

2          When I talk, you be quiet, and I will observe your

3     right to speak.

4          MR. GOLDMAN:  I apologize.

5          THE COURT:  Why are you raising this specter of the

6     fact that these folks are African-American?

7          MR. GOLDMAN:  I am just stating a fact to get to my

8     point.  It is not racial.

9          THE COURT:  What is your point?

10         MR. GOLDMAN:  It is that if you are -- who moves

11    around the most in our society?  People that live in

12    apartments, working class individuals.  They are most

13    prone to be caught by this gotcha provision.  Wealthier

14    people tend to stay in their homes longer.  But many of

15    the people who aren't move every year.  And they don't

16    update.  It is not -- in Richmond it just so happens, and

17    so they get caught in this.  They don't necessarily update

18    their registration until it gets closer to the election or

19    they know, I can still go back and vote in my owe own

20    precinct.  So they get caught in it.  That is why we have

21    this repeated, and we tried to do it in 2012, to fix it.

22    That is why we are here, because we haven't been able to

23    fix it.  It is nobody's fault.  It us not bad people.  I

24    am not suggesting that at all.  But I am pointing out the

25    facts.  I can't change who the plaintiffs were in these

1    cases.  They are working class people.  And that is why it

2    happens.

3        THE COURT:  Okay.

4        So let's try to wrap up your argument on the first

5    amendment point.  Have you given me all the points you

6    want to make on that or is there something else you want

7    to tell me about the rights to petition and the right to

8    ballot access?

9        MR. GOLDMAN:  I would just want to point out a couple

10   of things, Your Honor, if I may.

11       Number one, when they passed the first amendment it

12   only applied to the federal government.  It wasn't

13   connected to the right to vote, because the right to vote

14   was controlled by the states.  So the right to petition at

15   the time for many citizens was more important than the

16   right to vote.  Because every American citizen had the

17   right to petition.  But the right to vote was severely

18   limited.  Most citizens did not have the right to vote.

19   So the right to petition is extremely important.  It has

20   been connected up to the right to vote, but we need to

21   remember it is separate.  Also these individuals, as I

22   pointed out, they did everything the State asked them to

23   do.  The State could have with de minimus effort done some

24   of the other things to alert them.

25       THE COURT:  You have made that point.

1      MR. GOLDMAN:  In terms of how do they, and this may

2  probably is more due process argument --

3      THE COURT:  Are you then done with the first

4  amendment?

5      MR. GOLDMAN:  I think of all of the -- I am trying to

6  think -- yes.

7      THE COURT:  Okay.  Now tell me this.

8      Are you making a substantive due process argument or

9  a procedural due process argument?

10     MR. GOLDMAN:  You know, as many years I have tried to

11  figure that out, the difference.

12     THE COURT:  Well, procedural has got to do with

13  whether you get the kind of hearing that you are entitled

14  to before some right gets taken away from you.

15     MR. GOLDMAN:  It is probably both.  That is why I was

16  having trouble --

17     THE COURT:  All right.

18     MR. GOLDMAN:  I think they are both.

19     THE COURT:  Are you then challenging the regulations

20  and the statute as a violation of the substantive due

21  process right?

22     MR. GOLDMAN:  To the extent that I think the

23  regulations misinterpret the law, I am challenging their

24  substance, but --

25     THE COURT:  If that -- it has got to be more than

1   that.

2        MR. GOLDMAN:  Absolutely.

3        THE COURT:  Substantive due process violation.

4        MR. GOLDMAN:  To the extent --

5        THE COURT:  It has got to be of such a nature that it

6   shocks the conscience.

7        Now, that is the burden that you have got to show on

8   a substantive due process level.

9        Is that the argument you are making?

10       MR. GOLDMAN:  The argument I think is -- I am not --

11  that is not the sort of the gravamen of my argument.  The

12  gravamen of my argument is they didn't apply the statute.

13  As they implemented the statute they have -- they haven't

14  applied the statute, and therefore violated the clients

15  due process by not giving him the evidence gathering right

16  that he had, and by misinterpreting the statute and not

17  examining evidence they need to exam.

18       THE COURT:  So that is more of a procedural?

19       MR. GOLDMAN:  I really have trouble, you know they

20  kind of mix in there.  But the statute itself, I am not

21  challenging.  It is how they have applied it.

22       THE COURT:  So tell me what is wrong with the

23  procedural process that was followed here.

24       MR. GOLDMAN:  The statute says they have from the

25  time we got notice of disqualification you have five days

1    to file a notice, calendar days, and according the

2    regulation then the board is supposed to set the hearing

3    within five business days of getting the filing.

4        THE COURT:  So they -- he got the notice of

5    disqualification that went out, as I understand it --

6        MR. GOLDMAN:  June 21 at 10:00 o'clock.

7        THE COURT:  I will be quiet when you talk.

8        MR. GOLDMAN:  I apologize.

9        THE COURT:  You be quiet when I talk, okay?  This is

10   not a city council meeting where you can debate everything

11   you want.  All right?

12       June 21st the notice of disqualification goes out.

13       MR. GOLDMAN:  Correct.

14       THE COURT:  And June 27th is when the appeal was due?

15       MR. GOLDMAN:  No, Your Honor.  The appeal -- yes, he

16   had to file the appeal and his written evidence.

17       THE COURT:  And the written evidence is due the same

18   day.

19       MR. GOLDMAN:  Same time.

20       THE COURT:  That is more than five days after he gets

21   the notice.

22       MR. GOLDMAN:  But you don't count -- but you can't

23   under the law, because the fifth day was Sunday, you go

24   not next day.

25       THE COURT:  That is what I say.

1           MR. GOLDMAN:  You are correct.

2           THE COURT:  All right.

3           So you get until Monday, and he files it on Monday,

4      and then they have the hearing three days later.  They are

5      required to have the hearing within five days.  So they

6      comply with all that.  So, you know, the point of all that

7      I guess is that they want to get things resolved quickly

8      so that candidates can get on with their campaign and

9      voters can get on with deciding who so vote for.  So what

10     is the problem?

11          MR. GOLDMAN:  They didn't comply with it.

12          THE COURT:  Okay.

13          So they didn't comply with it because they should

14     have given him until midnight on the 27th to file his

15     evidence; is that right?

16          MR. GOLDMAN:  There are two ways of looking at that.

17          Number one, if you consider that he had to 11:59,

18     which would seem to be consistent with how they did it, he

19     had basically a whole extra day to collect information.

20     And that is very important, having done this.

21          Number two, according to the regulation they are

22     supposed to set the date of the hearing after they receive

23     the notice --

24          THE COURT:  The appeal.

25          MR. GOLDMAN:  -- the appeal.

1       But they did it backwards.  They set the date of the

2   hearing, and they also said when you had to file

3   everything.

4       THE COURT:  I don't know that either of those things

5   violates somebody's due process.  Remember that when we

6   talk about due process it is not State law or local law

7   that defines what process is due.  It is federal law.  And

8   in this case isn't it accurate to say that Mr. Schintzius

9   got a pretty full package of what the information was that

10  he needed to produce to the board?  And isn't that fair

11  notice of what is going on?

12      MR. GOLDMAN:  He didn't get all the

13  evidence-gathering time he was entitled to by the statute.

14  However --

15      THE COURT:  But, you know, let's go back and remember

16  that this is due process.  They told him what he had to

17  get, and they told him when he had to get it.  And it may

18  have been shorter than what was required by statute, but

19  as the Fourth Circuit has pointed out, federal courts are

20  not supposed to be supervising the conduct of elections.

21  We are supposed to be looking at the process in making

22  sure that a constitutionally acceptable process occurs.

23      It seems to me like you are asking more the former,

24  that I become sort of a super electoral board.

25      MR. GOLDMAN:  Well, then giving how you are viewing

1    it, let me look at it the from a different angle to

2    hopefully make you see it -- I understand your position,

3    correctly -- okay.

4        Let's look at the statute.  The statute says that you

5    have a hearing that is limited to whether, you know,

6    whether the rejections of the signatures are -- has been

7    reasonable.  That is all it says.

8        It is nothing in there that says --

9        THE COURT:  Says whether the decision is reasonable.

10   The decision made by the local electoral board.

11       MR. GOLDMAN:  I think whether it has been reasonably

12   objective --is reasonable.  Okay.

13       THE COURT:  Before you get into this, Mr. Goldman, I

14   have a criminal matter that will take about 20 minutes at

15   10:00 o'clock.  So we are going to take recess now to

16   allow me to get ready for that, and to get, to check

17   everything.  Everybody, you can leave your stuff at the

18   table.  Just slide it forward.  And I will be back here at

19   10:00 o'clock to deal with the criminal case.  All right.

20   Sorry to interrupt you.

21       MR. GOLDMAN:  Thank you.

22       THE COURT:  This was put on the docket at the last

23   minute.  All right.  Let's recess.

24                        (Recess)

25       Mr. Goldman, you were addressing the due process

1    issue.  You were getting ready to tell me -- you were

2    winding up telling me something.  I was not sure what it

3    was

4    And I have received a document signed by Mr. Schintzius

5    waiving any conflicts that exist.  So, that will take care

6    of that issue.

7        MR. GOLDMAN:  Thank you, sir.

8        I wanted to, based on Your Honor's questions, go back

9    to due process aspects of the hearing.  And to demonstrate

10    that the let State had the evidence before it to find that

11    my client had made the ballot, but they don't approach the

12    due process hearing really the way it was intended in the

13    statute.  The statute says that they will hold a hearing,

14    and if you can determine whether the citizens that have

15    been rejected, have been reasonably rejected.

16        But they don't look at evidence that is in their

17    possession.  In fact, the regulation, I think it is

18    10-20-50 of 30, basically says that the -- that is also in

19    the instructions of the Green book that they give the

20    registrar -- that the candidate has the burden of proof.

21        THE COURT:  You think that is a violation of due

22    process?

23        MR. GOLDMAN:  No.  It would be, but he doesn't have

24    the burden of proof under the statute.

25        THE COURT:  Okay.

1    I think that is a burden of violation of his right to

2    due process that if he wants to overturn an administrative

3    decision, he has got the burden of doing that?  That is a

4    violation of due process?

5    MR. GOLDMAN:  The statute says that he has,

6    candidates have been reasonably rejected.

7    In Virginia I believe the burden of due process is

8    also the burden of producing the evidence.  So, if he has

9    to produce the evidence, that is one thing.  But if it is

10   a question of whether the signatures have been reasonably

11   rejected, then I would suggest that the State cannot

12   refuse to look at information that is already in their

13   possession.

14   THE COURT:  Let me try to rephrase this question so

15   we can get this honed down to some fine points.

16   Do you think it is a violation of his due process

17   rights to impose the burden of proof of demonstrating that

18   it is unreasonable on Mr. Schintzius?  Yes or no?  You do

19   not?  Okay.  Thank you.  Go ahead.

20   But a lack of discovery is a violation of --

21   MR. GOLDMAN:  Yes.  Absolutely.  I do think it is --

22   remember the petitioners have had their signatures

23   disqualified, but they are not giving an independent

24   chance to show that their signatures have been unfair or

25   unconstitutionally disqualified.  That is being done

1    through the candidate.  I can understand the rational for

2    that.  But, Your Honor, if in fact, if the burden of proof

3    in Virginia requires Mr. Schintzius to produce the

4    evidence and therefore the board is -- can limit its

5    review to evidence produced by Mr. Schintzius, then in

6    effect they can say we don't, we don't have to look at

7    evidence that is in our possession, even if it is

8    probative.  But that is not the way the statute was

9    written.  The statute says, it has to, the board has to

10   decide whether it has been reasonably rejected and

11   therefore they have to look at the government's evidence

12   that is in their possession.

13       Let's also remember in this particular case it's not

14   like it is done in certain other states.  If I we look at

15   the Brisco case, Brisco versus Kusper case.  In Chicago,

16   the people that challenge the signatures were the

17   candidates.  The board actually, and the registrar was

18   sort of the -- you know the candidates challenge the

19   signatures the way they did, and then the board decides.

20   Here it is the registrar is the only one challenging the

21   signature.

22       I don't see how it is consistent with due process

23   that she could challenge the signatures but not look at

24   evidence in her sole possession that might show that she

25   is wrong.  And they never checked the signatures.  They

1    never checked the electoral history, and that is what I

2    was pointing out on Ms Brown.  Ms Brown voted in 2015.

3         THE COURT:  But the question then, it seems to me, is

4    that they are deciding whether it is reasonable under

5    Virginia law.  Is that right?

6         MR. GOLDMAN:  Not to look at the evidence that you

7    have.

8         THE COURT:  Well, whether it is -- whether the -- the

9    ultimate decision in the hearing before the electoral

10   board is whether the board made a decision that is

11   reasonable under Virginia law.

12        MR. GOLDMAN:  Yes, sir.

13        THE COURT:  In this case Virginia law includes the

14   regulation that a State Board of Elections, which say at

15   section 20-50-20, material omission from petitions.  And

16   one of those is if the signer provides an address that

17   does not match the petitioner signers address in the voter

18   registration system unless it is within the same precinct.

19        So, I mean, if that is what they are figuring out,

20   why is their decision unreasonable?

21        MR. GOLDMAN:  If I may be permitted to explain.

22        THE COURT:  Yes, you can be permitted to explain.

23   Please.

24        MR. GOLDMAN:  One of the reasons you are holding the

25   hearing is for -- let's take one of the people that they

1    accepted.  They initially disqualified Janet Jefferson

2    because she had put a residence address that was different

3    than her registration address.  But they ultimately

4    qualified her because Ms Schintzius put in in information

5    to show when she moved.  The move date I was talking

6    about.

7        THE COURT:  And apparently she moved within the same

8    precincts; is that right?

9        MR. GOLDMAN:  No.  She moved within the same -- they

10   moved based on, like Ms Brown, you can move anywhere in

11   Virginia.  But if you move a little bit before that then

12   you have to stay within the City and the congressional

13   district.  So you can move.  It is the basic general point

14   that even if you, even if you put -- you don't put your

15   registration address on the petition, they will still

16   count you.

17       You have to -- I have said, that I don't think

18   that -- I don't think that should be the law because the

19   definition of the signer doesn't do the move date.  We can

20   disagree with that, I think Ms Showalter and I disagree

21   with that, so let's use her definition.  She counted

22   Ms Jefferson.  Okay.  She could determine.

23       THE COURT:  More accurate to say the Richmond

24   Electoral Board.

25       MR. GOLDMAN:  Probably more accurate to say on her

1    recommendation.  They asked her for her recommendation.

2    Absolutely right, Your Honor.

3         So that, they said, well, we could determine when the

4    move date was.  All right.

5         They couldn't determine whether the move date was,

6    they said for Ms Brown, because Mr. Schintzius had not put

7    in that.  What I am suggesting is they had evidence they

8    could have used to reasonably determine when her move date

9    was.

10        THE COURT:  What evidence was that?

11        MR. GOLDMAN:  She had voted in 2015 at her

12   registration address.  That means that she had to show up

13   at the, at the polling place and demonstrate to the

14   election official that she was entitled to vote there.

15        THE COURT:  So, they should go back and look at old

16   voting records to determine whether or not somebody lives

17   at the address they say they are at?  Is that --

18        MR. GOLDMAN:  Accepting her statement they accepted

19   Ms Jefferson's statement that she moved.  Just her

20   statement.  They have no way of knowing whether it is true

21   or not.  But assuming she is telling the truth.  The point

22   is, the move date, you can show that Ms Brown, by the

23   evidence they had voted at an address where she had to

24   prove that that was her residence -- in order to vote at

25   that precinct she had to show that she was still living at

1    her residence address.

2        Now, would it have been more ideal if he had told the

3    board, yes, but they wouldn't let him saying anything at

4    the hearing.  This is the hearing where he is not allowed

5    to present any evidence at the hearing.  All the evidence

6    has to written and presented on June 27 nothing at --

7    nothing -- there is nothing --

8        THE COURT:  Did he get something from that lady that

9    he submitted, the lady, Ms Jefferson?

10       MR. GOLDMAN:  Yes, he got --

11       THE COURT:  Signed an affidavit or something?

12       MR. GOLDMAN:  Yes, she put that in.  He forgot to ask

13   the other person to put it in.  He knew -- obviously he

14   knew when they moved.  He forgot to ask them.

15       So --

16       THE COURT:  I want to know what evidence he presented

17   about Ms Jefferson.

18       MR. GOLDMAN:  He presented that --

19       THE COURT:  What form of document was it?

20       MR. GOLDMAN:  It was a written document.

21       THE COURT:  Okay.  It was a written document.  Was it

22   an affidavit, or a post card?

23       MR. GOLDMAN:  It wasn't an affidavit.  Affidavits

24   aren't really -- registrar sort of requires them, but that

25   is not what the State regulation --

1      THE COURT:  What did he submit, Mr. Goldman?

2      MR. GOLDMAN:  He submitted --

3      THE COURT:  Things would go a lot smoother if you

4  answer the question.

5      MR. GOLDMAN:  Yes, sir.  Submitted a piece of paper

6  she had signed.

7      THE COURT:  Was it signed under oath?

8      MR. GOLDMAN:  No.

9      THE COURT:  Under penalty of perjury?

10     MR. GOLDMAN:  Not signed under oath.

11     THE COURT:  So he was allowed to submit a document

12 from her that was not under oath, and they accepted that

13 as evidence.

14     MR. GOLDMAN:  Correct.

15     THE COURT:  Okay.

16     So why didn't he do that for the others?

17     MR. GOLDMAN:  He did for some of them.  Some he

18 forgot to get them to sign, some he forgot to put in the

19 move date.

20     THE COURT:  Wait a second.  How could he forget to

21 have somebody sign something that he is getting ready to

22 submit to the Board of Elections, Electoral Board?

23     MR. GOLDMAN:  I recognize -- I could report the facts

24 as they are.

25     THE COURT:  Okay.  Go ahead.

1      MR. GOLDMAN:  But I am saying they could have figured

2  out what the move date was.  If she voted here in 2015,

3  then she had to move after that date, which turns out to

4  be true.  If they knew that, they would have counted her

5  signature.  And they had electoral history.  But they

6  don't accept -- in order to have voted at that address,

7  the registration address, in 2015 general election she

8  would have had to show evidence of that to the election

9  officials.  They could have challenged her under the law.

10  They could challenge, and they didn't.  They accepted it.

11      So I think that shows that she lived there on 2015,

12  and because of that, she falls under this.  She can go

13  back there as long as she stays in Richmond, she can go

14  back to that address without ever, you know, could live

15  some place else in Richmond in this district, which she

16  does, without updating her registration address and still

17  vote there.  She can go vote where she voted before.  If

18  they now that, they would have counted her.  That is why

19  they counted Jefferson, because she said, I moved, and

20  they said, well --

21      THE COURT:  They counted Jefferson because Jefferson

22  submitted a sheet of paper that said, this is where I

23  live.  And apparently he didn't do that for the first one,

24  which is, I can't remember her name Antoinette --

25      MR. GOLDMAN:  Brown.

1          THE COURT:  -- Brown.

2          MR. GOLDMAN:  Except she signed the petition.

3          THE COURT:  No, no.  Did she submit a paper for the

4     hearing?

5          MR. GOLDMAN:  Did, but it wasn't signed.

6          THE COURT:  So it was not signed.  So, but --

7          MR. GOLDMAN:  Not signed, but they knew --

8          THE COURT:  It could have been done by Mr. Goldman.

9     It could have been.

10         MR. GOLDMAN:  Excuse me?

11         THE COURT:  You could have prepared it.

12         MR. GOLDMAN:  That is true, Your Honor.  But anybody

13    else could sign -- that is part of my point, they approved

14    signatures that they never checked based on registration

15    addresses that they don't know whether people moved.

16         THE COURT:  Okay.  This has moved to a different

17    level in which the signature -- in which the ability of

18    somebody to sign a petition is now under challenge seems

19    to me like it is pretty minimal to ask them to write a

20    note and sign it to the electoral officials.

21         MR. GOLDMAN:  Should have done it better.  I am not

22    suggesting that that isn't the case.

23         THE COURT:  These things are designed so that they

24    can have an election that runs on some sort of orderly

25    process.  And what you are suggesting is that we have a

1    procedure that is outlined in the code, and that the

2    electoral board outlines, and then a separate election

3    procedure that applies to Mr. Schintzius.  That is just no

4    way to run a railroad.

5        MR. GOLDMAN:  With all respect, I don't think that is

6    what I am suggesting.  I am going through the facts that

7    they have a system where they assume if somebody's

8    registration address is given, that that is where they

9    lived, because that is what the law requires.  The law

10   says you have to sign the petition with the resident

11   address.  Says nothing about a registration address.

12   Okay.  Because you might not live there.  So if you sign

13   that you live at XYZ Street and you are registered at XYZ,

14   they assume that is your residence.  Okay.

15       THE COURT:  What else do you have to say about the

16   due process issue?

17       MR. GOLDMAN:  I think that not allowing -- giving an

18   example -- he was at the hearing and they disqualified one

19   of the signatures because they wouldn't allow him to point

20   out the page number and the line as to where that

21   signature appeared in their petition.  He forgot to put

22   that in the written.  She had signed something, but forgot

23   to put that -- and that is the kind of procedure it was.

24   Why couldn't they let him at least point that out?  That

25   is certainly de minimus.  He is sitting there.  They had

1    the petition in front of them.  Those are the kinds of

2    things to my way of thinking when you add it all up, he

3    didn't get enough gathering time, they didn't look at

4    evidence that they possessed, which would have shown these

5    people, even though he had not put in the move date, would

6    have shown that they moved within a period that allowed

7    them to be qualified voters, that there is a -- they

8    required him basically to talk to somebody who was an

9    ineligible voter in order to make a petition, allowing

10   illegible signature, when you can point it out it isn't

11   illegible.  All of these things were things were possible,

12   if they had done that.  I am not trying to change any

13   rules for just him.  I am not excusing the fact that he

14   should have probably have done better.  Absolutely.

15       I am not -- but, as I say, if they had just done

16   that, de minimus, he would have gotten his 50 signatures.

17   If you had someone like Ms Brown, or in 2012, 2013, 2014,

18   2015, and she signs the petition and says this is who I

19   am, and there is one person like that in the whole

20   district --

21       THE COURT:  I understand that he could prove it.  The

22   question is a different one, though.

23       It is, how does it violate his right to due process?

24       MR. GOLDMAN:  Because he is defending the

25   Constitutional rights of the people whose signatures were

1    declined to have that.  Were never told that.  And he is

2    just -- and the State has said, look, you have this

3    hearing, nothing about you can't present evidence at the

4    hearing.  There is nothing about you having to limit this.

5    There is nothing in the statute that says that you have to

6    produce all the evidence.  The statute says, should the

7    signature -- is it reasonably rejected?  I am suggesting

8    that if the government doesn't look at probative evidence

9    in its exclusive possession that it can't possibly be

10   reasonable.  If it is not reasonable, then it violates the

11   statute in Virginia, and that violates due process.

12       THE COURT:  No.  If it violates the statute, it

13   violates the statute.  Due process is something else, as

14   we talked about earlier.  Due process is something that is

15   required by the Constitution, not by the statute.

16       MR. GOLDMAN:  I am not --

17       THE COURT:  And the Fourth Circuit has cautioned, I

18   am not here to serve as a super electoral board.

19       MR. GOLDMAN:  I am not asking you to do that.  What I

20   am I saying is that when they violate --

21       THE COURT:  You are.  You are asking me to say that

22   they are supposed to a different way than they have done

23   it.

24       MR. GOLDMAN:  They should give him the time to

25   present the evidence or the have to look at evidence that

1    is in their possession.  I think it's the government takes

2    the Constitutional right away from anybody, and they have

3    evidence in their possession that would show they are

4    wrong, that, I argue, is a violation of the due process

5    clause of the Constitution, because it is violation of the

6    first amendment or first amendment through the due process

7    clause.  That is what they did in this case.

8         They had the evidence, and didn't look at it.

9         THE COURT:  Okay.  Do you have any other points on

10   due process?

11        MR. GOLDMAN:  No.  Just I can show how we can qualify

12   the voters here were qualified, given the evidence.

13        THE COURT:  Apparently if he could just get them to

14   sign a post card saying that they lived there, that would

15   have been enough.

16        MR. GOLDMAN:  Could it have been done better?  Yes,

17   absolutely.

18        THE COURT:  All right.  Well, okay.

19        Address then for me, if you will, please, the issue

20   of latches in this case.

21        MR. GOLDMAN:  Yes, Your Honor.

22        I believe the defendants have cited Marcellus, and I

23   believe Perry One and Perry Two is there.  Leading

24   authorities are basically in those areas.

25        Obviously you are familiar with the Perry One

1   situation.

2       THE COURT:  Pretty familiar with that one.

3       MR. GOLDMAN:  That was a case where they challenge

4   the out-of-state circulator statute and they knew that,

5   they had months to do it.  Months before to do it.

6       The statute was there.  If they were going to

7   challenge it they could have done it four or five months

8   ago and they kind of waited until the very end.

9       THE COURT:  Right.

10      MR. GOLDMAN:  In Marcellus it had to do, I think,

11  with the 2001 law where you can list certain people on the

12  ballot.  And some -- that was a big thing in the State.

13  Some people you could have parties and things or you

14  others you couldn't.  They thought it should apply -- I

15  believe Powhatan supervisors, and they knew that months

16  before, and they waited closer to the election to

17  challenge that.  That would have upset all across the

18  State if that had been ruled unconstitutional.

19      THE COURT:  But the issue here is I think simpler

20  than that.  What they are saying is that on June the 30th

21  Mr. Schintzius knew that he was not going to get on the

22  ballot, and he waited until a couple weeks before the

23  ballots had to be printed to go out to soldiers and

24  sailors overseas in order to file his law suit.

25      Why isn't that latches?

1     MR. GOLDMAN:  I mention Marcellus and the others to

2  show they were challenging the constitutionality of the

3  statute and would have known that months before.  We

4  couldn't possibly know what his thing would be that he

5  could challenge until they actually had their quasi

6  judicial proceeding.

7     THE COURT:  That was the 30th.

8     MR. GOLDMAN:  That was the 30th.

9     THE COURT:  Of June.

10    MR. GOLDMAN:  Okay.  The statute says it is final.

11  The statute says you are not supposed to be able to

12  challenge it.  It takes a while to look at that.  Takes a

13  while to find the plaintiffs.  If you want to know the

14  whole process --

15    THE COURT:  Mr. Schintzius knew who they were.  And

16  he knew who he is.

17    MR. GOLDMAN:  He was looking for someone who would

18  represent him, which is pretty normal, you know.  In this

19  particular case I had to go out and did all the particular

20  work, and we filed, I think on the 23rd.  So they were

21  served roughly on the 24th or 25th.

22    All right.

23    In 2012, this is comparison -- in the 2012 case

24  Justice Hughes -- he wasn't the justice that granted the

25  actual temporary injunction, I believe it was on September

1    5th.  On September 5th they actually they had the final

2    hearing, the date of the ballot was supposed to be

3    printed.  In between he gave us a couple of days to get

4    some information, and then -- okay.

5         So basically we had filed for the temporary

6    injunction before that time in 2012.

7         So for some reason the judges in Richmond, I guess

8    the first judge recused himself, and took him a while to

9    find a judge, and when they found a judge the judge

10   basically said, I can't hear it for another week.

11        In terms of the what the other side -- they have not

12   filed any motions.  I see where, is it Cortes, he filed

13   something.  He could have filed that before.  They could

14   have told --

15        THE COURT:  Well, the point is not when they could

16   have filed something.  It is when Mr. Schintzius filed.

17        MR. GOLDMAN:  If they were really concerned about the

18   time, they didn't have to wait until the day before the

19   hearing to move it to federal court.  They could have

20   moved it right away.  In fact, one of the lawyers told me

21   when he said -- I won't say who -- said, well, this is

22   nothing, had nothing to do with the fact that the lawyers

23   couldn't practice in fed, it is what we always do.  If you

24   are always going to do it, why did you wait until the day

25   before the hearing and then come over here and say, oh

1    everything is waited too long.  You could have done it

2    then.  So I don't see any latches on our part.  You can't

3    prepare a law suit overnight.  Now, if the argument is

4    well, he should have filed pro se, I just don't think -- I

5    don't see anything that requires that.

6        THE COURT:  Okay.  I understand your point.  Anything

7    else on that point?

8        MR. GOLDMAN:  Yes.

9        If there is any dilatoriness, we change the law in

10   2013.  So you would have a kind of hearing where you could

11   present the evidence.  We changed the law in 2013 so you

12   could recount people.  If anybody is being dilatory, they

13   are here three years later fighting over that.  This is

14   the first case on this particular statute, and on that --

15       THE COURT:  Well, obviously it is easy to get on the

16   ballot because, just evidenced by the number of people

17   running for mayor.

18       MR. GOLDMAN:  I wrote that law.  Absolutely, it was

19   written so you could get on the ballot.  The only

20   remaining procedure you have is 50 in each district, or

21   should you just have five hundred city wide?  And there

22   are reasons back and forth.  Fifty seemed to be

23   Constitutional.  So it was 50.

24       Turns out that is a little harder than you might

25   think in certain districts, but, yes, it is certainly

1   Constitutional.  Certainly fair.  And nobody is saying --

2        THE COURT:  Well drafted by you.

3        MR. GOLDMAN:  I don't know about that, sir.  But

4   thank you.

5        So, no one is suggesting -- they do suggest in the

6   book, their opposition they had various months to collect

7   it.  It absolutely true --

8        THE COURT:  Do you have any additional points to make

9   on the latches issue?

10       MR. GOLDMAN:  Latches, unless I missed something, I

11  think I handled their cases, and I have laid out the

12  absolute way we handled the case.  You know, those are the

13  facts.

14       THE COURT:  Thank you very much.  You may be seated.

15       Can you move the sign there?

16       I can't read that, unfortunately, from here.  That is

17  okay.  I understand.

18       MR. GOLDMAN:  This is the move date.

19       THE COURT:  All right.

20       So, let's hear from Ms Showalter's attorney first in

21  this case.

22       MR. MATHESON:  Good morning, Your Honor, may it

23  please The Court.

24       THE COURT:  Yes, good morning.  Where is Mr. Tunner

25  today?

1      MR. MATHESON:  He was in indisposed and not able to

2  come to the hearing.

3      THE COURT:  Okay.

4      MR. MATHESON:  I am standing in for him.  He is in

5  Syracuse.

6      THE COURT:  That is certainly indisposed.

7      MR. MATHESON:  Your Honor, we are here on a motion

8  for a temporary restraining order, which I know that The

9  Court knows is extraordinary remedy.

10     THE COURT:  Let me just tell you how I view the

11  factors that go into a TRO.

12         I tend to agree with Mr. Goldman that if

13  Mr. Schintzius doesn't get on the ballot he, and possibly

14  the plaintiffs in this case, are likely to suffer

15  irreparable harm.

16         I think the balance of equities sort of tips because,

17  on the one hand we have the needs of the Electoral Board

18  to have a process that moves forward in an orderly way,

19  but on the other hand, there is always an interest in

20  having a variety of candidates on the ballot.

21         And, finally, as to the public interest, I think the

22  same factors come into play there.

23         So I think that the question is whether he has been

24  able to establish a strong likelihood of success on the

25  merits.  And that is what I would like you to address.  I

1    would like you to address three points on that.

2        One is the first amendment issue.  Two is the due

3    process issue.  And third is the latches issue.

4        MR. MATHESON:  Yes, Your Honor, I am prepared to

5    address each of those, but in addition, I would like an

6    opportunity to talk about the public interest, and I think

7    it relatedly affects the balancing of the equities in this

8    case.  I want The Court to understand what the general

9    registrar and the State Board of Elections calendar is

10   between now and September 23.

11       THE COURT:  I have seen it all in the documents you

12   submitted.  I am aware that there is an interest in moving

13   forward with getting the documents out.

14       Tell me about the things that i mentioned.

15       MR. MATHESON:  Yes, Your Honor.

16       Your Honor, I am going to start with the due process

17   issue, if that is okay.

18       The Court has asked a number of pointed questions

19   about whether or not this is really a procedural due

20   process challenge.  I cited in the Hutchinson decision in

21   my brief, and there is number of other decisions in this

22   circuit that deal with the issue of when something becomes

23   a Federal Constitutional issue as opposed to when it

24   becomes an issue of the administration of the State

25   election law procedures.

1        Your Honor, respectfully, I don't believe that the

2    issues that they are their raising, Mr. Goldman, for one,

3    said he is not actually challenging the Constitutionality

4    of the administrative procedures that are set out not only

5    in the Code of Virginia, but also are published in

6    Virginia Administrative Code under 1VAC 20-50-30.  He is

7    saying he doesn't think that the decision at the electoral

8    board level was correct.

9        There is --

10    THE COURT:  Well, that is not the issue in the case.

11    They could be as wrong as you can be, and my job is not to

12    correct any mistakes that they might make at the electoral

13    board level.  My job, if anything, is to make sure that

14    the process that they use comports with due process.  It

15    seems to me that the process that they use told

16    Mr. Schintzius what the issue was, what their decision was

17    on that issue, what he had to do to appeal that and when,

18    he had to file the documents to appeal that.

19        Is it your contention that that complies with due

20    process?

21    MR. MATHESON:  Our contention is that does comply

22    with due process, and we believe that the procedures that

23    were published and publicly available through the State

24    Board of Elections regulations were followed in this case.

25    There has been a number of issues that have been raised

1    for the first time on August 23rd of 2016 when this law

2    suit was filed.  They are talking about the timing of when

3    the appeal was actually filed.  We are not here on an

4    issue --

5        THE COURT:  You are not here on an issue of timing.

6    He got notice of what the issues were, and a chance to put

7    on his evidence.  And I don't think I can rule that that

8    was an unconstitutionally short period of time.

9        What about this issue of what information he was

10   allowed to have?  Under Virginia law isn't he entitled to

11   a list of who the registered voters are?

12       MR. MATHESON:  Yes.  For a nominal fee by statute he

13   is entitled to obtain a list of the registered voters.  In

14   addition to that, Your Honor, the petition process begins

15   on January 1st of 2016.  So from January 1st to June 14

16   all candidates can have circulators out in the public

17   collecting signatures.  And they are allowed to submit

18   their petition pages to the general registrar at any time.

19       THE COURT:  Okay.  But, he is allowed to get a list

20   of who the registered voters are, and does that have their

21   registered address, or their residence address on it?

22       MR. MATHESON:  It would have the registration

23   address.  If the residence address is different from

24   registration address the registrar has no way of knowing

25   that, unless somebody comes in with his own of kind of

1    extrinsic evidence.

2        THE COURT:  Unless he gets a petition with a

3    different residence address on it.

4        MR. MATHESON:  If she gets a petition with a

5    different residence address, and in addition, if there is

6    an election after somebody moves and they present

7    themselves at their former precinct to vote, if they

8    state -- if somebody either challenges their qualification

9    or if they state have changed their address, they are

10   required by statute to fill out an affirmation of

11   eligibility.  That forms goes to the registrar.  So if any

12   of these voters had actually done as Mr. Goldman suggests,

13   had gone to the prior precincts in the last election and

14   voted, then had they presented their correct residence

15   address, they would have been listed as qualified voters

16   under the address that was their residence.

17       THE COURT:  Okay.  The question is, I am just trying

18   to get what information he is entitled to, because he says

19   that there were secrets, there was secret information that

20   the registrar had that he didn't have access to.

21       MR. MATHESON:  Okay.  I understand.  So, voter

22   registration information, the actual registration

23   application that has a signature card with it, that is

24   submitted to the registrar when the person initially

25   becomes registered to vote, that is what we are talking

1    about.

2         THE COURT:  Is it available to him?

3         MR. MATHESON:  It is available to him, it is

4    FOIA-able.  There is certain information that would be

5    redacted if he had requested a copy of that information,

6    such as social security numbers and birth dates and stuff

7    like that.

8         THE COURT:  He can call them up and they will print

9    out a computer list of names and addresses, right?

10        MR. MATHESON:  Well, print out a list of names and

11   addresses, but he is entitled to even more information

12   than that.  If Mr. Schintzius wanted to obtain a copy of

13   the voter registrar information, he has every opportunity

14   to do that.  He didn't ask for any of that information in

15   this case.

16        THE COURT:  All right.

17        Now, was Mr. Schintzius given an opportunity to talk

18   at the hearing?

19        MR. MATHESON:  Yes.  And the hearing is recorded.  I

20   have a transcript of the actual hearing that took place.

21        THE COURT:  Let me see the transcript.

22        MR. MATHESON:  Sure.

23        THE COURT:  Mr. Goldman says he wasn't.

24        MR. MATHESON:  Shows he was not only given an

25   opportunity to speak at the hearing, but this issue of Ms

1   Smith of not -- him not being able to excuse me -- this

2   issue of him not being being able to augment the record

3   with the page and line number of where Ms Smith signed the

4   petition is just not accurate, Your Honor.  Ms. Showalter

5   asks on the record, I think three different times, says,

6   if Mr. Schintzius will just supply the page and line

7   number that she signed that she would be happy to count

8   Ms Smith's signature -- and the time that he addressed the

9   electoral board he didn't come forward with that

10  information.

11      THE COURT:  All right.

12      Well, it looks like he spoke at the hearing,

13  Mr. Goldman.  What do you think about that?

14      You said he wasn't given a chance to say anything at

15  the hearing.  Unless this transcript is total fabrication

16  looks like he had a chance to talk.

17      MR. GOLDMAN:  Could I have a minute or two?

18      THE COURT:  Can you have what?

19      MR. GOLDMAN:  Permitted to just talk?

20      THE COURT:  Why don't you just ask him whether he got

21  to talk or not.

22      MR. GOLDMAN:  Okay.

23      THE COURT:  You need to stand up when you talk.

24      MR. GOLDMAN:  I just asked him, and what he said was

25  because he had been told that he wouldn't be allowed to

1    speak, he wasn't prepared to name the page and line

2    number.  So, apparently -- but he was -- apparently he was

3    asked --

4        THE COURT:  Okay.  So he was was allowed to talk.

5    All right.  So he was allowed to talk at the meeting.

6        Thank you for that candid admission.

7        MR. MATHESON:  Here is the real issue with the voter

8    registration information as well.  Even -- they are saying

9    that not that Schintzius -- well, they are saying that

10   Schintzius was denied access to those materials, which we

11   dispute.  They are also saying that the general registrar

12   should have reviewed that at the appellate stage.

13       THE COURT:  Well, that is in the next question that I

14   was going ask.  Why didn't they just look back at their

15   own information.

16       MR. MATHESON:  Well, number one, what they are saying

17   is that by looking at the signature cards that are

18   contained in the voting registration records, that that

19   would have enabled the registrar to identify the signers

20   of petitions with persons who appear in the voter

21   registration system.

22       THE COURT:  Let me ask you this.  Is it true what he

23   says that if somebody sent a note in signed by them not

24   under oath or anything that they would change the -- that

25   they would use that as admissible evidence in this

1    hearing?

2        MR. MATHESON:  There were three signatures, and there

3    have been a fourth signature had they had the page and

4    line number that were actually counted on the strength of

5    unsworn documents that were provided by Mr. Schintzius

6    that were signed by the voters.

7        THE COURT:  Is it true what Mr. Goldman says, that if

8    somebody had moved and sent in a letter saying they had

9    moved, but it was still within the district, that they

10   would count that as a viable legitimate signature for the

11   petition?

12       MR. MATHESON:  Not necessarily.  Here is the issue.

13       Council districts are a creature of the locality.

14   The State Board of Elections defines the criteria for

15   whether or not somebody is a registered voter.  And the --

16   or a qualified voter, excuse me -- and the qualifications

17   are tied to the precincts.

18       THE WITNESS:  I understand.  The question is, in this

19   case would the Richmond Electoral Board have used, allowed

20   somebody's signature on a petition to go forward if they

21   had moved but it was in the same councilman district?

22       MR. MATHESON:  Only if it was intra precinct they

23   would have.  If it was inter precinct, within the same

24   district, they would have needed information about the

25   move date to determine whether or not they were qualified

1    to return to their polling place at the time they signed

2    the petition.

3        THE COURT:  Okay.

4        MR. MATHESON:  So there is two issues that are raised

5    there.  When the registrar is checking the validity of

6    these signatures, often times she is unable to identify

7    the person who signed the petition if there has been a

8    change of residence address if somebody signs Tom Smith

9    and they provide a unique address that doesn't appear in

10   the various, data base of registered voters, she doesn't

11   know which Tom Smith that is.  Even if it is a unique name

12   like Anquinette King, if there is only one instance of

13   Anquinette King, she doesn't know if there is another

14   Anquinette King out there who could register to vote

15   tomorrow, and she is not able to distinguish between the

16   two.  That is --

17       THE COURT:  What else do you have to say about the

18   due process point in this case?

19       MR. MATHESON:  Well, the other point is that they

20   have conceded in their brief that it would be completely

21   impracticable for the registrar to be reviewing the

22   signature cards on voter registration packets as part of

23   their process.  What they are suggesting is that once

24   things move to the appeal stage it should be incumbent

25   upon the registrar to go back and redouble her efforts by

1    looking at voter registration materials.  Even if the

2    voter registration materials were dispositive, in a case

3    where we have nine signatures that are being contested,

4    then perhaps, you know, there is an argument that could be

5    made that it is not a huge intrusion to have to look at

6    this information.  But what about the next challenge there

7    is 2,000 signatures being reviewed on appeal.  That is why

8    the appeal procedure that has been laid down by the State

9    Board of Elections stated that the appeal is limited to a

10   review of whether or not the signatures were reasonably

11   rejected.

12       Ms Showalter did not depart from any of the usual

13   practices that she follows to determine whether or not the

14   signers were qualified.

15       As you noted, there were eight candidates.

16       THE COURT:  Let's turn to the first amendment issue.

17       MR. MATHESON:  Okay.

18       Your Honor, the first amendment issue is, their

19   primary contention is that essentially that there is a

20   gotcha provision in the code, because the signers provide

21   their residence address, and that may not be the same as

22   the registration address.

23       THE COURT:  Well, I don't think the first amendment

24   requires them to put a notice on the document that says if

25   your registration is different than your residence, please

1   let us know.  There is no authority that that is what the

2   first amendment requires.

3       MR. MATHESON:  I am not aware of any authority that

4   the first amendment requires that either.

5       Your Honor, there is also a regulation, a material

6   omissions regulation attached to the complaint, 1 VAC

7   20-50-20 that lays out exactly what the criteria that

8   registrars are going to use for passing on the validity of

9   petition signatures.

10      THE COURT:  Section C 5 that says if you have an

11  address that is different than your residence then you are

12  not qualified to be on the petition.

13      MR. MATHESON:  And C 5 specifically addresses this

14  issue of cannot identify.  The last clause says, and the

15  signer can be reasonably identified as the same registered

16  voter.  So if they have the last four digits of Social

17  Security number and that lines up with information related

18  to a known voter with the same name then that might solve

19  the problem with five.  If it is a new residence we also

20  have to look at each E 1, which says that the registrar

21  has to determine that the person is qualified to return to

22  the polls and vote at the time they sign the petition.

23  And she can't do that without the move date.

24      All of that information could have been provided by

25  Mr. Schintzius.  And to the extent that he did provide it,

1    again on the strength of unsworn evidence, he was credited

2    with those signatures.

3         THE COURT:  All right.  Okay.

4         What other things do you have to say about the first

5    amendment argument?

6         MR. MATHESON:  Well, Your Honor, again, the

7    fundamental disagreement here is about the -- the

8    fundamental disagreement is about whether or not certain

9    petitions should have been counted based on the

10   administrative code and the practices of the General

11   Registrar in accordance with those in this locality.  I

12   looked back to the Hutchinson case.  This doesn't state a

13   Constitutional claim.  They are not asking for declaratory

14   relief for The Court to rule that there is a particular

15   statute or regulation that should be ruled invalid here.

16        I would commend one case to The Court.  I don't

17   promise you this is the only citation I will give you

18   today, but there is a Second Circuit case.  This is

19   actually Justice Sotomayor, who was Judge Sotomayor in the

20   Second Circuit.  The citation is 470 F 3d 458.  And she

21   actually followed Hutchinson where there was a case of due

22   process challenge to somebody being removed from the

23   ballot based on a procedure for voters to test the

24   candidacy of interested candidates.  She raised both

25   procedural due process and the first amendment.  And the

1    exact same argument was made in that case as is made here,

2    which is that, well, you know, Mr. Goldman was saying we

3    are here because the petition, the people who signed the

4    petitions have first amendment rights, and those rights

5    were taken away.  And the reason that it is a federal due

6    process issue is because of their first amendment rights.

7    And Sotomayor rejects that.  She says, we note that a

8    contrary would permit any plaintiff to obtain federal

9    court review of even the most mundane election dispute

10   merely by adding first amendment claim to his or her due

11   process claim.

12        THE COURT:  All right.  I understand that point.

13        MR. MATHESON:  Okay.

14        THE COURT:  I think that is kind of what they are

15   asking me to do here is delve down into the intricacies of

16   the electoral process and second guess the decision made

17   here.  That is what they are trying to do.  And that is

18   what the Fourth Circuit has told my not to do.

19        MR. MATHESON:  Your Honor, as far as the latches

20   argument is concerned, I am going to respond.  I think,

21   the issue is whether or not by the -- whether or not by

22   the defendants removing the case to federal court

23   that that is somehow alters the latches framework.  I

24   don't think that it does.

25        THE COURT:  Why did you all wait so long to remove

1    it?

2       MR. MATHESON:  Well, Your Honor, the service of this

3    law suit was obtained on either August 24th or August 25,

4    and we had the intervening holiday weekend.  If you look

5    at the Labor Day weekend, that Monday, which was the sixth

6    of September, the courts were closed and we moved the case

7    on the seventh.

8       THE COURT:  Well, okay, but that gave you a whole

9    week in the middle to do it.  Well, Okay. go ahead.

10      MR. MATHESON:  Well, Your Honor, I mean, I don't

11   think it can be said we have waited.

12      THE COURT:  That is, as I pointed out to Mr. Goldman,

13   the alacrity with which you removed this isn't the issue.

14   The issue is whether they waited too long to file it.

15      MR. MATHESON:  My client received an e-mail from the

16   printer on Sunday that said that there may by an order for

17   ballots coming in from Fairfax today, and if that happens

18   then they may have their ability to obtain their own test

19   ballots pushed back an additional 48 hours, which would

20   put additional pressure.  And we are waiting for a ruling

21   on this TRO.  If it comes out favorably, we are going to

22   be on the phone with the printer because our ability to

23   comply with the State statute is in serious jeopardy.

24      THE COURT:  I understand that it just horrible if I

25   issue relief in this case.

1          MR. MATHESON:  Yes, Your Honor.  Thank you.

2          THE COURT:  All right.  Thank you.

3          All right.  Etherington, do you have anything to add?

4          MR. ETHERINGTON:  No, sir, Judge.

5          THE COURT:  All right.  Thank you.

6          Mr. Johnson, do you have anything to add to that?

7          MR. JOHNSON:  Unless The Court has questions, I think

8     Mr. Matheson covered it.

9          THE COURT:  Okay.  All right.

10          Mr. Goldman, what do you have to say in response?

11     There is one question I want you to answer, which is, why

12     is the State Board a party to this case?  Am I supposed

13     order them to do something?

14          MR. GOLDMAN:  Your Honor, under the code they are

15     supposed to supervise the registrars, and we made them a

16     party in the other case, and it is unclear -- basically

17     they claim we don't.  So, it is unclear, so you have to

18     put them in for the very reason that if you don't, then

19     you are stuck on the other side.

20          THE COURT:  That is exactly what would happen.  If

21     you had not put them in, they would be crying wolf that

22     you should have added the State Board as a defendant.

23          Go ahead.

24          MR. GOLDMAN:  Thank you, Your Honor.

25          I was happy for them to at least concede that if

1    there is only 9 signatures to check, that may be that

2    might be something that they could do, de minimus effort,

3    to make sure somebody had a constitutionally protected

4    right, which is what I was trying to allowed to in

5    comparing it to Libertarian Party versus Judd.  That you

6    have a strict -- you have a protected Constitutional

7    right, and the government is trying to take it away,

8    and/or put a burden on it.  And so the Ashcroft case says

9    that the government has to justify, it is basically if

10   somebody proposes an alternative that that is not less

11   burdensome.  What could be less burdensome then looking at

12   9 signatures to find out whether they match the signatures

13   so you know that is the person?  It is not that hard.  He

14   mentioned what happens if there is 2,000 signatures.

15   Well, the only way there can be 2,000 signatures basically

16   would be for a state-wide race.

17        THE COURT:  Well, we have those once every four

18   years.

19        MR. GOLDMAN:  In order to have 2,000 signatures

20   questioned, having done this enough time, you would have

21   to have an incredible number of signatures -- and that

22   would be number one.  Number two, they would be sent

23   around, wouldn't be 2,000 from one registrar.  The way

24   they do it is either the party can do it, and the party

25   can do whatever it wants, actually,if you look at the law.

1    They don't even have to check.  They can just say you are

2    on the ballot.  You should that, but the law has kind of a

3    loophole that way.  Or they send the signatures out to 135

4    registrars.  It is not like one person has to look at

5    2,000.

6         THE COURT:  Like in the 2008 election, as I recall,

7    there were thousands of new voters in Richmond so there

8    could easily have been hundreds if not thousands of

9    challenges.

10        MR. GOLDMAN:  They would have to be on the ballot.

11   Of course, in that case the Republicans weren't getting a

12   lot of signatures in Richmond.  But, it doesn't -- the

13   fact that something might happen doesn't excuse you not to

14   do something that is in front of you.  We are talking

15   about these plaintiffs not --

16        THE COURT:  But their point is that the law has to

17   address contingencies beyond Mr. Schintzius' case.

18        MR. GOLDMAN:  I think they could come in here in

19   federal court and say it is too much effort for 2,000.

20   Under that theory, even it is one they could excuse it.

21   The question is, was it too much to ask in this case.  I

22   think they conceded that it wasn't.

23        THE COURT:  The question is, is it too much to ask in

24   all cases.  Because that is what we have to look at when

25   we are determining the validity of the law.

1          MR. GOLDMAN:  They are arguing it would be too much.

2          Well, you don't have to, if you don't have to notify

3     somebody that your signature might not be counted, and you

4     don't have to check the signatures, and then when you hold

5     a due process hearing don't give them enough time.  Yes,

6     any one of those things, if I cut my arm one time, I am

7     not going to bleed out.  But by the time I get to number

8     seven I will bleed out.  What is the cut that kills me?

9     Was it first one or the seventh one?

10          I think that is a little disingenuous for them.  They

11     set up the system.  They don't have to -- they set up the

12     system this way.  That is the government saying, yes, the

13     law requires, the petition says you have got to have your

14     signature and your residence.  They keep passing over

15     this.  That is what the law says.  That is what is on the

16     petition.

17          Whether you like it or not, that is what the

18     legislature said.  Do they actually ever check the

19     signature?  No.  Do they have any idea whether the

20     registration address is the residence address?  No.  So it

21     is an interesting system they set up to -- all I am

22     proposing here, which is really not that complicated, and

23     it is based on the Libertarian Party case, is, look, we

24     all admit it is a constitutionally protected right.  We

25     all know people are going to move.  We have move dates.

1    If you had just done the de minus, check the evidence in

2    in your possession, you would have realized these were

3    qualified voters.  Should my client --

4        THE COURT:  That is the real problem.  Problem from

5    his standpoint is he didn't call up Paul Goldman at the

6    right time.

7        MR. GOLDMAN:  I don't know if that is the problem now

8    or before.  But the question is, it shouldn't really

9    depend upon who you call.  The question should depend

10   upon, there should be some reverence for those important

11   rights that people have spent a lot of time fighting for.

12   We thought we had hanged the legislation before, and in

13   fact, a couple things that he said in terms of, so they

14   conceded.

15       THE COURT:  They made it pretty easy for

16   Mr. Schintzius.  All he had to do was a get a note with

17   somebody's signature, and they would say, okay, you can be

18   on it.

19       MR. GOLDMAN:  The regulations don't require that.

20   When talking the regulations, if you look at the

21   regulation that the board put out it, doesn't require you

22   to put in any information.  It only requires you to talk

23   about signatures and indicate the specific reason.  There

24   is nothing in the statute which says you can't present

25   more information about at the hearing.  In fact, think

1    about it.  Why hold a hearing and not let him present the

2    information at the time?  Absolutely.  Nobody told me

3    that.  They gave him a chance to point out a page number,

4    and I just found that out today, should have known it

5    before, but at the same time he was told he couldn't

6    present any evidence at the hearing.  That is a good

7    reason perhaps that he didn't know the page number.

8         What we have shown is a system where people who are

9    going to exercise their Constitutional rights.  The

10   government knows some people will fall into the gotcha

11   zone.  They know people move.  They know it from the Ryan

12   case.  They know it from the fact that they have move

13   regulations to cover that.  They know there are people

14   that are going to move, not register, an then go back to

15   their old address.  Oh, man, I want to vote for the

16   president.  I can go back.  They know that.  They know

17   that.

18        We changed the statute.  And the statute says for

19   signing a petition you just have to be on the voter list

20   and an active voter.  All those people were.  What this

21   case is about is really quite simple.  The government is

22   going to burden first amendment rights of Virginians.  How

23   much burden are we going to allow the government to put?

24   I have shown how the government had evidence that could

25   have shown those people were in fact entitled to sign a

1  petition.  So what what we are deciding today is not

2  simply being a super electoral board.  We have a good

3  electoral board, we have a good registrar, I'm not saying

4  that.  I may disagree, but I am not denying that.  What we

5  are saying is, okay, how much burden will we put on these

6  six people?

7      They want to talk about, well, we don't know what is

8  going to happen.  Maybe I will come in with 5,000

9  signatures next time.  It is only nine.  Would it be

10 different if I had 5,000 people, and they were all of poor

11 people, and would that -- it should amount to one person,

12 everybody, write a petition in the Virginia Constitution,

13 not just in the -- our construction.  They took it

14 probably from Pennsylvania is where they got it.  The

15 bottom line here is the government had the information.

16 They had an obligation.  They cut off the gathering time.

17 They knew people would fall into the gotcha provision they

18 cut off allowing someone to present evidence at a hearing.

19 I suggest you look at all of it, and that is an excessive

20 burden under the Libertarian Party case on a first

21 amendment right when they are easier more de minimus ways

22 to do it.

23     THE COURT:  Okay.  Thank you very much.

24     MR. GOLDMAN:  Thank you.

25     THE COURT:  I appreciate your work on this.  I

1    appreciate you coming in to take Mr. Morrisey's place,

2    because it is good to have a lawyer here.

3         I appreciate the work that both sides have done in

4    submitting written memoranda in this case.

5         I am not going to issue a temporary restraining order

6    in this case.

7         Let me go through the factors.  The first factor is

8    the likelihood to suffer irreparable harm in the absence

9    of preliminary relief.  Well, if Mr. Schintzius does not

10   get on the ballot, that is about as irreparable as it can

11   be.  And it certainly hurts the people that have supported

12   him as well.  And in a sense takes away their right to

13   vote, and not their -- not right to vote, but the right to

14   petition the government.  So I think that there is

15   irrepairable harm in the absence of preliminary relief

16   because it is possible, I suppose, to change the ballot

17   between now and the magic moment.  But, difficult.

18        Second, the balance of equities.  I think that goes

19   both ways.  On the one hand you have the got the Boards

20   need for same sort of administrative regularity.  On the

21   other hand, the equity which is pointed out by Mr.

22   Goldman of having just nine people that they could have

23   checked, and couldn't they have handled it some way

24   differently here, and the equity of having somebody that

25   is on the ballot.  You know, their are equities both ways

1    in this case.

2         The public interest I think goes pretty much both

3    ways as well for the same reasons as balance of the

4    equities.

5         But where we run into problems in this case is

6    likelihood of success on the merits.  The case law is

7    pretty clear that the plaintiff in order to obtain

8    preliminary injunctive relief has to produce evidence

9    showing a strong likelihood of success on the merits.  And

10   when he wants mandatory injunctive relief on a preliminary

11   basis, that is to say, he wants the defendants to change

12   something that they have already done, it is an even

13   stronger requirement of likelihood of success on the

14   merits.

15        I simply -- with respect to the due process issue, I

16   think that one -- that just is a non starter in this case.

17   This gentleman had every opportunity to put in every bit

18   of evidence that he wanted to.  He had access to voting

19   records or information from the registrar, and all he had

20   to do was get something from the voters themselves that

21   said, this is where I live, and this is where I am

22   registered.  And it would have solved the problem.  I

23   don't know whether he would have gotten nine or not, and

24   we will never know that, will we?  Because he didn't

25   submit the information.

1    It didn't have nobody notarized.  It just had to be

2    a signed letter or note from the person in question.

3    With respect to the first amendment issues in this

4    case, I think that the requirement that has been imposed

5    here is more than reasonable.  It is that somebody provide

6    a valid registration address and -- sorry, a valid

7    residence address and use that as a proxy for the

8    registration address.  They require people to re-register

9    promptly when they move.  So I think they are entitled to

10   assume that the residence and registration are the same

11   address.

12   And it is a more than reasonable way of insuring that

13   the people who sign the petition are the people who are

14   folks who are allowed to do so.

15   I am not going to do a written opinion in this case.

16   I will do an order today.

17   Although Mr. Goldman raised the specter of this being

18   a racial issue, he has admitted, I think, that this is not

19   a racial question in this case.

20   And I can't help but note that in his petition

21   Mr. Goldman has cited little, if any, authority for the

22   positions that he has taken in this case.  So I think that

23   he is skating on thin ice as far as the likelihood of

24   success on the merits goes.  So I will deny the temporary

25   restraining order.

1      Now, as I understand it the date on which the ballots

2  need to be finalized is when?

3      MR. MATHESON:  Well, Your Honor, ballots were

4  supposed to be finalized Friday.

5      THE COURT:  When do they need to be sent out to these

6  people overseas in foreign jurisdictions?

7      MR. MATHESON:  They need to be mailed by the 23rd,

8  which is a Friday.  But there is actually a deadline

9  before that that is equally pressing.  That is the

10  deadline for the certification and sealing of the voting

11  machines.  And the registrar cannot perform the logic and

12  accuracy testing to insure that the voting machines are

13  ready for the election by the deadline, which is

14  September 20, if they don't have the test ballot in hand

15  because the ballot and the software for --

16      THE COURT:  How long does it take to get a test

17  ballot?

18      MR. MATHESON:  48 hours, Your Honor.

19      THE COURT:  When is it that they need to have it in

20  hand?

21      MR. MATHESON:  Thursday.

22      THE COURT:  Why do they need to have it Thursday.

23      MR. MATHESON:  Because they need -- they need two

24  days for logic and accuracy testing of the ballot.  And

25  then they have to prepare the machines for the Electoral

1    Board inspection on the 19th and 20th.  And then from 20th

2    to the 23rd there will be assembling mailings of absentee

3    ballots.

4         THE COURT:  All right.

5         I am going to set this case down for trial on

6    Thursday the 15th at 9:00 a.m.

7         If you have any additional evidence, bring it in

8    then.

9         If you have any additional authority, that would be a

10   good time to have it to me.

11        I am not going to require you to submit a brief in

12   advance, because you have already briefed this.  But if

13   you have some cases that support your position a little

14   better than the ones you have relied on, those would be

15   helpful.

16        You and you can bring me copies of them or bring me

17   the citation and my law clerk will get me copies of them.

18        I know that is a short time line.  Is there

19   additional information, Mr. Goldman, that you need to get

20   from the defendants?

21        MR. GOLDMAN:  Excuse me?

22        THE COURT:  Is there additional information you need

23   to get the defendants before the trial of this case?

24        That is not a fair question to ask you right now.  I

25   will give you until -- this is Monday.  I will give you

1  until 5:00 o'clock today to give them a written list of

2  any additional information you need from them.  This is

3  going to be your discovery in this case.

4      MR. GOLDMAN:  Thank you, sir.  I will give it to Ms

5  Showalter?

6      THE COURT:  Give to it Mr. Matheson, the lawyer.  We

7  are in litigation now.

8      Mr. Matheson, if you have objections to that, or

9  anybody else has objections to that, they are to get those

10  objections to me by noon on Tuesday.

11      And your answers are due by 9:00 o'clock Wednesday

12  morning.  We can play with that a little bit.  Depending

13  on what he asks for, although I can't see how a lot of

14  information is going to change what we have in this case.

15      MR. MATHESON:  Your Honor, just to clarify, when you

16  say answer, are you talking about our exhibit list or

17  responsive pleadings?

18      THE COURT:  This case isn't going to have exhibit

19  lists and witness lists, or any of that stuff.  We are

20  going to try this case like people used to in the '60s.

21  Come into court with your witnesses.  The answers to his

22  questions.  He is going to give you some questions.  Have

23  you filed an answer in the case yet?

24      MR. MATHESON:  We filed a demurrer and special plea

25  of latches in state court.

1       THE COURT:  Have you filed an answer?

2       MR. MATHESON:  No, Your Honor.

3       THE COURT:  Have the rest of you?

4       MR. JOHNSON:  No, Your Honor.

5       THE COURT:  Answers are due Tuesday at noon.  The

6   complaint is only 80 pages long.  You should be able to

7   answer that by this time tomorrow.

8       All right.  Sorry to put you on such a short time

9   line, but I can't help but observe that the rights that

10  the plaintiffs are asserting in this case are important

11  ones, and I want to give them every opportunity that they

12  can to get on the ballot in this case.  Or to have at

13  least their petitions fully considered.

14      MR. MATHESON:  Your Honor, one thing, if I can

15  clarify.  Are we permitted to print the ballots today?

16      THE COURT:  You are permitted to do whatever you want

17  to today, because there is no TRO, but if you lose on

18  Thursday, you better be prepared to have yourself in gear.

19      MR. MATHESON:  Okay.

20      THE COURT:  All right.

21      MR. MATHESON:  You know --

22      THE COURT:  Let me tell you something, Mr. Matheson.

23  We are in an age of computers.  You can change stuff

24  overnight, as I have found out from lawyers submitting

25  revised briefs overnight.  So you can do that.  You may

1    have to pay some more, but if it turns out you lose this

2    case, you are going to have to change the ballot.  All

3    right?

4         MR. MATHESON:  Yes, Your Honor.

5         THE COURT:  Don't look at me with big eyes like it is

6    horrible.  Because I know you can do it.  I know Ms

7    Showalter can do it, because she is able to do it.

8         MR. MATHESON:  Very well, Your Honor.

9         THE COURT:  All right.

10        Anything else?  All right.

11        There was something else I was going to say until

12   Mr. Matheson got up and diverted my attention.

13        We have got answers due.  I know what it is.  You

14   have demurrers and/or motions to dismiss that are filed in

15   this case.  You should be prepared to argue those on

16   Friday as well.  And we will -- they are on Thursday,

17   rather.  And we will take all that as part of closing

18   argument in this case.  What we are going to do is we will

19   come in, put the evidence on, and then decide essentially

20   whether there is a legal case to go forward at the end.

21   All right?  Anything else, counsel?

22        All right.  Let me thank you all or for coming in on

23   such short notice.  I look forward to seeing you all on

24   Thursday.  If you don't have anything to add to what you

25   have said today, just let us know.  All right.  Thank you

1    all very much.

2        Let's recess court until 2:00.

3

4        The foregoing is a true and correct transcript.

5

6                Gilbert Frank Halasz, RMR

7                 Official Court Reporter:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25